Sean LUNDY, Appellant,

v.

Marcos V. MASSON, M.D. and Global
Orthopaedics, Inc., Appellees.

No. 14–06–00581–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

April 29, 2008.

Rehearing Overruled July 10, 2008.

Timothy A. Hootman, Lance Christopher Kassab, Houston, for appellant.

George R. Gibson, Rod E. Gorman, Seth Adam Miller, Thomas Michael Ballases, Houston, for appellees.

Panel consists of Justices YATES, FOWLER, and GUZMAN.

## OPINION

LESLIE B. YATES, Justice.

In twenty-three issues, appellant Sean Lundy appeals the jury verdict rendered in favor of appellees Marcos Masson, M.D. and Global Orthopaedic Solutions, Inc. ("Global") on their claims of fraud and breach of fiduciary duty. We reform the judgment in favor of Masson to reflect an election of remedies, and we affirm as reformed. We affirm the judgment in favor of Global on its breach of fiduciary duty claim. We reverse and render that portion of the judgment in favor of Global on its fraud claim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In July 2001, Marcos Masson, M.D., an orthopaedic upper extremity surgeon, formed Global to design and produce orthopaedic surgical devices. In November 2001, three new members joined Global— Mark Henry, M.D., a partner at Masson's orthopaedic surgical practice, Houston Hand and Upper Extremity Center, L.L.C. ("Houston Hand"), Sean Griggs, M.D., a former partner at Houston Hand, and Sean Lundy.[1]

Henry first introduced Masson to Lundy in the summer of 2000. At that time, Masson owned MasTech, a surgical device company. Lundy and Henry, who had a close and longstanding friendship dating back to college, were partners, along with Donny Byrne, in a company called Orthopaedic Retractors, Inc. ("ORI"). In 1999, Byrne had executed an agreement with Lundy and Henry in which he had assigned his retractor patent and related technology to ORI in exchange for a one-third ownership interest in the company.

The purpose of the meeting between Lundy and Masson in the summer of 2000 was to explore a possible merger between

---

1. At the time that Griggs was a partner, Houston Hand was known as Houston Hand and Microsurgical Center. The practice ceased its operations in the summer of 2003.

MasTech and ORI. Following the meetings, Lundy disappeared for approximately one year, ostensibly due to personal problems.[2] Shortly after Masson formed Global in July 2001, at Henry's urging, he interviewed Lundy to be President of Global. In the course of their discussions, Masson asked Lundy about the status of the patent that Byrne had assigned to ORI. Lundy told him, "No problem. There was a two-year contract that we had, or I did with Byrne, because Mr. Byrne apparently owed—owned the patent for retractors ... [a]nd now that the two-year contract is up, we can do whatever we want with it. It's not a problem."

In December 2001, Lundy began his employment as President of Global.[3] His compensation included an annual salary of $200,000 and a 20% ownership interest in Global. In addition, Masson agreed to loan $75,000 to Lundy, payable to Global, to assist him in moving from Virginia and buying a new home in Houston. Masson testified that Lundy was responsible for managing the company which included, among other duties, hiring employees, preparing a business plan, negotiating vendor and distributor contracts, identifying manufacturers for the company's products, researching industry standards for pricing and packaging issues, learning about the sterilization process, and maintaining the financial books and records.

In December 2001, Masson also loaned Global $450,000 as start-up cash and signed a promissory note payable to Bank of America for a revolving line of credit in the amount of $1,000,000. Houston Hand also made numerous cash loans to Global totaling more than $670,000. Over the next two years until Global ceased its operations, the company's sales fluctuated greatly. According to Masson, Lundy told him that Global's sales were between $50,000 to $100,000 per month and, based on Lundy's assurances, Masson believed that "things were going great." However, Masson became concerned about Global's financial condition when some of the company's officers called him to complain about Lundy's absence from the company and he learned that several employees had been fired. When Masson requested financial information from Lundy, Lundy refused to provide it to him. Dawn Burks, Global's Vice President of Operations, testified that when she attempted to provide Masson with financial information at his request, Lundy became angry and forbade her from providing any financial reports to Masson without first securing his approval.

In October 2002, Cindy Reichek, Global and Houston Hand's controller, resigned because of differences with Lundy and Henry. Lundy told Masson that Cindy had made "a mess" of the bookkeeping and proposed working at Houston Hand for three to four weeks to "clean the books," to which Masson agreed. When Masson later became concerned about Lundy's extended absence from Global, Henry reassured him that they needed Lundy's help at Houston Hand and that Lundy would return to Global. Lundy worked at Houston Hand for approximately ten months

---

**2.** During this time, Lundy and his family lived in North Carolina. Lundy's father-in-law, who had provided most of the funding for ORI, sued Lundy for fraud stemming from the loan.

**3.** An L.L.C. is composed of members as opposed to shareholders, as in a corporation. *See* TEX. BUS. ORG.CODE ANN. § 101.101 (Vernon Supp.2005); *T.R.Q. Captain's Landing L.P. v. Galveston Cent. Appraisal Dist.,* 212 S.W.3d 726, 741 n. 3 (Tex.App.-Houston [1st Dist.] 2006, pet. granted). Section 6.02C of Global's Regulations provides that the manager may delegate authority and duties to other managers, as well as assign titles, including the title of President.

and, according to Masson, never returned to Global's offices. Masson later learned that Lundy and Henry had executed an employment agreement—without Masson's knowledge—under which Lundy was to begin working full-time for Houston Hand as its General Business Manager beginning in May 2003.[4]

In May 2003, Global was converted from an L.L.C. to a corporation. At trial, Masson testified that he agreed to the conversion based on Lundy's representation that it was for tax purposes. As shareholders of the corporation, Masson and Henry each owned 39.5% of Global and Lundy owned 20%. Lundy was named President and Chief Operating Officer, Masson was named Chairman of the Board, and Henry was named Chief Science Officer.

In June 2003, in an effort to raise $3,000,000 to further Global's business development, Lundy prepared a private placement memorandum to present to outside investors. Lundy told Masson that the additional money would enable them to "grow the company" and to repay the $450,000 loan to Masson. Ultimately, no one invested in Global as a result of the memorandum.

In July 2003, Masson received the first financial report regarding Global from the company's accountant, Lamont Grogan. The profit and loss statement showed that Global had lost more than $570,000 in 2002. The balance sheet revealed, among other things, a negative balance of $592,313.99, and that the entire $1,000,000

line of credit extended to Global by Bank of America had been drawn down.[5] In addition, the balance sheet did not reflect the loans from Houston Hand to Global.

On August 13, 2003, Masson filed suit against Lundy alleging fraud, conversion, and breach of fiduciary duty and requested that the court appoint a receiver for Global.[6] On December 12, 2003, the trial court appointed Charles Gerhardt as receiver for Global. Based on his findings, Gerhardt filed cross-claims on behalf of Global against Lundy alleging fraud and breach of fiduciary duty.[7] In December 2005, a jury trial was held which lasted five days.

At trial, Gerhardt testified about his assessment of Global's financial condition. In an effort to determine whether the business could be operated, he interviewed numerous people, including Lundy, Masson, and Byrne, reviewed Global's books and financial records, and inspected Global's facilities and existing inventory. Gerhardt discovered that Global had no remaining employees and no money in its bank accounts, the existing inventory was not capable of being sold, there was no insurance in place, and the accounts receivable were uncollectible. Based upon all of the information available to him, Gerhardt determined that Global could not be run. He also concluded that Global's problems were the result of Lundy's malfeasance, and not simply bad business judgment. Gerhardt testified that he decided to sue Lundy on behalf of Global because of (1) Lundy's failure to properly document the $75,000

---

4. Henry signed the employment agreement on behalf of Houston Hand in his capacity as Managing Partner but never informed Masson of the agreement. Exhibit A to the agreement reflects Lundy's duties and responsibilities at Houston Hand and lists among them, "Perform duties as the President of Global Orthopedic Solutions."

5. Bank of America subsequently sued Masson and Henry based upon their personal guarantees.

6. Masson voluntarily non-suited his conversion claim at the conclusion of plaintiffs' case-in-chief.

7. The other causes of action for conversion and theft were subsequently dismissed.

promissory note in Global's financial books reflecting the loan made to him by Global and his subsequent denial in his deposition that he had ever seen or signed the note, (2) Byrne's lawsuit,[8] (3) the inaccurate financial information reflected in Global's accounting software, and (4) the "grossly misleading" financial projections in the private placement memorandum prepared by Lundy.

At the conclusion of trial, the jury rendered a verdict in favor of Masson on his claims of fraud and breach of fiduciary duty, awarding him $985,000 in actual damages and $500,000 in punitive damages. The jury also found in favor of Global on its fraud and breach of fiduciary duty claims, awarding the company $150,000 in actual damages and $175,000 in punitive damages.[9] Lundy filed a motion for new trial, which the trial court subsequently denied. Lundy timely filed this appeal.[10]

## II. STANDARD OF REVIEW

### A. Legal Sufficiency

When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it does not have the burden of proof, that party must demonstrate on appeal that there is no evidence to support the adverse finding. *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 123 (Tex.App.-Houston [14th Dist.] 2003, pet. denied); *Price Pfister,*

*Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 347 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983)). To prevail on a legal sufficiency challenge to a question on which it had the burden of proof, a party must establish that (1) there was no evidence to support the jury's finding and (2) the evidence established a contrary proposition as a matter of law. *IKON Office Solutions*, 125 S.W.3d at 123; *Schwartz v. Pinnacle Commc'ns*, 944 S.W.2d 427, 431–32 (Tex.App.-Houston [14th Dist.] 1997, no writ).

We consider all of the evidence in the light most favorable to the jury's verdict, indulging every reasonable inference in favor of the prevailing party. *Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 347 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (citing *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998)). We will sustain a legal insufficiency point when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of a vital fact. *Price Pfister*, 48 S.W.3d at 347 (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997)). If the record contains any evidence of probative force to support

8. Byrne filed suit against Global, Masson, Henry, Lundy, and John Egbert, Global's patent attorney, alleging claims of negligence, gross negligence, theft of trade secrets, conversion, breach of fiduciary duties, and conspiracy. On March 30, 2005, Byrne, Global, and Masson settled the claims against Global and Masson.

9. In its final judgment, the trial court reduced the punitive damages award to Global to $100,000.

10. In their brief, appellees object that appellant's brief exceeds the fifty page limit set forth in Texas Rule of Appellate Procedure 38.4. However, because appellant filed a motion for leave to extend the page limit, which we subsequently granted, the brief is not in violation of Rule 38.4.

the jury's finding, we must overrule the legal insufficiency point. *Id.* (citing *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997)). The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *See City of Keller v. Wilson,* 168 S.W.3d 802, 819 (Tex.2005). It is the court's charge as it was submitted to the jury that measures the sufficiency of the evidence when the opposing party fails to object to the charge. *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000).

### B. Factual Sufficiency

When reviewing a challenge to the factual sufficiency of the evidence, we must examine all of the evidence in the record, both supporting and contrary to the judgment. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989); *IKON Office Solutions,* 125 S.W.3d at 123. After considering and weighing all of the evidence, we will sustain the challenge only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Marsh v. Marsh,* 949 S.W.2d 734, 739 (Tex.App.-Houston [14th Dist.] 1997, no writ).

### III. ANALYSIS

### A. Fraud

■ To recover on an action for fraud, a party must prove that (1) a material representation was made, (2) the representation was false, (3) when the speaker made the representation, he knew it was false or made it recklessly without knowledge of the truth and as a positive assertion, (4) the speaker made it with the intention that it should be acted upon by the party, (5) the party acted in reliance upon it, and (6) the party thereby suffered injury. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 758 (Tex.2001) (orig.proceeding); *Formosa*

*Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998); *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.,* 237 S.W.3d 379, 385 (Tex.App.-Houston [14th Dist.] 2007, no pet.).

### 1. Masson

### a. Cause of Action

In issues one and two, Lundy contends the evidence is legally and factually insufficient to support the jury's finding in favor of Masson on the fraud issue. Specifically, he argues that the evidence does not demonstrate that he misrepresented the status of Byrne's retractor patent or that he failed to disclose certain facts during his job interview with Masson.

The record reveals that Byrne (who is not a party to this suit) obtained a patent on a surgical device called a retractor in 1994. In 1999, he agreed to assign his retractor patent and technology to ORI in exchange for a one-third ownership interest in ORI. The assignment provided that "[i]n the event that ORI has failed to provide marketing and commercialization services regarding retractor devices, including those encompassed by the claims of U.S. and foreign patents owned by Byrne, by the end of a three year period beginning with the Effective Date of this Agreement [February 11, 1999], Byrne and/or Surgical Innovations L.L.P. have the right to request that the Retractor Technology be reassigned to Byrne and/or Surgical Innovations L.L.P. Upon such an event and the request of Byrne and/or Surgical Innovations L.L.P., ORI will execute such a re-assignment document."

At trial, Byrne testified that when he learned from Henry that ORI no longer had funding to continue its operations, he requested that ORI reassign the patent to him pursuant to the agreement. However, despite Byrne's efforts to contact them,

neither Henry nor Lundy returned his calls or otherwise communicated with him. Masson testified that when he asked Lundy in 2001 about the status of Byrne's patent, Lundy told him, "No problem. There was a two-year contract that we had, or I did with Byrne, because Mr. Byrne apparently owed-owned the patent for retractors ... [a]nd now that the two-year contract is up, we can do whatever we want with it. It's not a problem." When Byrne contacted a friend who was a sales representative in the orthopedic industry to discuss marketing his retractor, he learned that the product was already being manufactured and sold by Global. Masson testified that the retractor was Global's initial main product.

■ Based on our review of the record, we conclude the evidence is both legally and factually sufficient to support the jury's fraud finding. First, the evidence shows that Lundy made a false, material misrepresentation to Masson. When Masson asked Lundy about Byrne's retractor, Lundy told him that the patent was "not a problem" and that they could do whatever they wanted to with it. However, as the agreement between Byrne and ORI clearly illustrates, this was not the case. Upon Byrne's request and the expiration of a three-year period, ORI was contractually bound to reassign the patent to Byrne. Further, as evidenced by Masson's testimony, this representation was material because the retractor became Global's initial main product. *See Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 613 (Tex.App.-Waco 2000, pet. denied) ("Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question.").

Second, the evidence supports the jury's findings that Lundy knew of the falsity of this representation, or at least made it recklessly without knowledge of the truth, and intended Masson to rely upon it. Lundy testified that he was involved in the negotiations of the terms of the agreement between ORI and Byrne and that he approved the terms. Byrne testified that Lundy would not return his call or communicate with him after he requested that ORI reassign the patent to him. At the very least, this evidence creates the inference that Lundy acted recklessly when he told Masson that Byrne's patent would not be a problem and that they could do whatever they wanted to with it and that he intended Masson to rely on it. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986) (noting that fraudulent intent is not susceptible to direct proof and must invariably be proven by circumstantial evidence); *Solutioneers Consulting, Ltd.*, 237 S.W.3d at 386.

■ Finally, the evidence supports the jury's findings as to Masson's reliance on Lundy's misrepresentation and as to the resulting injury. Masson relied on Lundy's assurance that they could use Byrne's retractor technology when he loaned $450,000 in start-up cash to Global and personally guaranteed a $1,000,000 line of credit. Masson also relied on Lundy's misrepresentation when Global began manufacturing its retractor using Byrne's technology and selling its product on the market. Lundy argues that Masson knew about Lundy's dealings with Byrne because Masson had previously met with Byrne to discuss combining ORI, MasTech, and Byrne's company and, therefore, could not have relied upon Lundy's representation regarding Byrne's patent. *See Wright v. Sydow*, 173 S.W.3d 534, 546 (Tex.App.-Houston [14th Dist.] 2004, pet. denied) (concluding that plaintiff's knowledge of alleged misrepresentation precluded reliance on statement as matter of law). Even assuming this is true, it is unclear

from the record what precisely Masson allegedly knew about Lundy's "dealings" with Byrne, and it does not demonstrate that Masson knew that Byrne was entitled to reassignment of the patent.

As a result of his reliance, Masson suffered damage when (1) he was sued by Byrne for, among other things, conversion, arising from Global's use of Byrne's patent technology, and ultimately settled the claims against him, (2) he was sued by Bank of America based on his personal guarantee of the $1,000,000 line of credit to Global, on which $200,000 was still outstanding at the time of trial, and (3) he was not repaid any portion of the $450,000 loan to Global. *See, e.g., Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 269–70 (Tex.App.-Corpus Christi 2006, pet. denied) (finding legally sufficient evidence of out-of-pocket damages where, appellee, in reliance on appellant's fraud, expended funds for business activities). The jury awarded Masson out-of-pocket damages in the amount of $400,000 and $100,000 for damage to past credit.

As such, we find the record contains evidence of probative force to support the jury's finding in favor of Masson on the fraud issue and that such a finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We overrule issues one and two.

**b. Broad Form Submission**

In issue five, Lundy contends that the broad form of the fraud question was defective. He argues that because Masson asserted two distinct factual theories—*i.e.,* a failure to disclose during the interview process and an affirmative misrepresentation based on Byrne's patent—the jury should have been required to specify the theory upon which it based its answer.

Broad form jury charge submissions are mandated by Texas Rule of Civil Procedure 277 whenever feasible. Tex.R. Civ. P. 277; *Texas Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990). The comments to Texas Pattern Jury Charge ("PJC") 105.1, which is the question submitted in common law fraud cases, state that a broad-form question should be appropriate in most cases involving claims for fraud and should be accompanied by appropriate instructions and definitions as provided under PJC 105.2–.4. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 105.1 (2006). The comments to PJC 105.2 state that "[i]f more than one definition is used, each must be separated by the word *or,* because a finding of any one type of misrepresentation would support recovery." Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 105.2 (2006).

■ The fraud question follows verbatim the suggested language found in PJC 105.1–.4. Question No. 1 asks "Did Sean Lundy commit fraud against Marcos Masson?" and then provides instructions and definitions, separated by the word "or," for both intentional misrepresentation (PJC 105.2–.3) and a failure to disclose (PJC 105.4). Contrary to Lundy's assertion, trial courts may combine several species of fraud into one broad form fraud question and are not required to ask the jury to specify the grounds for its answers. *See E.B.,* 802 S.W.2d at 649 (holding trial court is not required to ask jury to specify ground on which it relied to answer question in jury charge); *Formosa Plastics Corp., USA v. Presidio Eng'rs & Contractors, Inc.,* 941 S.W.2d 138, 146 (Tex.App.-Corpus Christi 1995), *rev'd on other*

*grounds,* 960 S.W.2d 41 (Tex.1998). Lundy's fifth issue is overruled.

### c. Jury Question No. 8

In issue three, Lundy contends that the trial court erred in handling the jury's answer to Question No. 8. Specifically, he argues that the court should have instructed the jury of the nature of the problem in writing and sent them back for further deliberations. *See* Tex.R. Civ. P. 295.[11]

Question No. 8 asked the jury, "What was the amount of Sean Lundy's compensation from Global?" The jury answered "$260,000." [12] When the jury verdict was returned and read in open court, the following exchange between the court and the jury took place:

The Court: Question No. 8, you have this little mark.

The Presiding Juror: Tilde in the front.

The Court: What does that—does that mean anything?

The Presiding Juror: We tried to say approximately.

The Court: Well, it cannot be approximately.

The Presiding Juror: Strike the tilde. I need to take off the tilde then.

The Court: Does everybody agree with that?

Jurors: Yes.

The Court: So there is no tilde in there?

Jurors: Right.

The Court: Is that correct?

Jurors: Correct.

The Court: That's an affirmative answer by everyone present. Mr. Stenson, if you would please indicate that by initialing that portion right there, please.

The Presiding Juror: Yes.

The Court: Thank you very much. All right. I ask the presiding juror if this is a unanimous verdict of the jury?

The Presiding Juror: Yes, Your Honor, it is.

■ Lundy did not object to the jury's answer to Question No. 8 or to the manner in which the court dealt with it before the jury was discharged. He first raised the issue of how the trial court handled the jury's answer in his motion for new trial. Texas Rule of Appellate Procedure 33.1(a) requires a party to present to the trial court a "timely request, objection, or motion." To preserve error, an objection to an incomplete or unresponsive verdict, or conflicting jury findings, must be made before the jury is discharged. *See Fleet v. Fleet,* 711 S.W.2d 1, 3 (Tex.1986); *Greater Houston Transp. Co. v. Zrubeck,* 850 S.W.2d 579, 586 (Tex.App.-Corpus Christi 1993, writ denied) (noting that errors which must be brought to trial court's attention before jury is discharged are those that may be cured by further deliberation); *Roling v. Alamo Group (USA), Inc.,* 840 S.W.2d 107, 109 (Tex.App.-Eastland 1992, writ denied) (concluding trial court must be made aware of alleged error so it can prevent or correct error).[13] Issue three is overruled.

---

11. Rule 295 states, in relevant part, "If [the purported verdict] is incomplete, or not responsive to the questions contained in the court's charge, or the answers to the questions are in conflict, the court shall in writing instruct the jury in open court of the nature of the incompleteness, unresponsiveness, or conflict, provide the jury such additional instructions as may be proper, and retire the jury for further deliberations."

12. Lundy's employment records, which were admitted as an exhibit, reflect that his gross pay from January 2002 to August 2003 totaled $259,615.46.

13. While it is arguable whether the jury's answer to Question No. 8 constitutes an incomplete or unresponsive verdict, or conflicting jury findings, as contemplated by Texas Rule of Civil Procedure 295, the rationale requiring an objection before the jury is dis-

■ In issue four, Lundy contends that, assuming we find no error in the trial court's handling of the jury's answer to Question No. 8, the finding should nevertheless be set aside because it is immaterial. A question is immaterial when it should not have been submitted, it calls for a finding beyond the province of the jury, such as a question of law, or when it was properly submitted but has been rendered immaterial by other findings. *Southeastern Pipe Line Co. v. Tichacek,* 997 S.W.2d 166, 172 (Tex.1999); *Spencer v. Eagle Star Ins. Co. of Am.* 876 S.W.2d 154, 157 (Tex. 1994). In the charge conference, Lundy's counsel objected that Question No. 8 should not be submitted because "it's an immaterial finding because it doesn't go to any issue here." Similarly, in his appellate brief, Lundy asserts that "a finding as to what Mr. Lundy's compensation from Houston Hand and Global was has no significance whatsoever with regard to the manner that issue was submitted in relation to Dr. Masson's fraud or breach of fiduciary duty causes of action."

Masson presented evidence that Lundy earned a total of $259,615.46 while employed at Global. He also testified that he had relied on Lundy's misrepresentation regarding Byrne's patent, among others, when he agreed to hire Lundy and pay him an annual salary of $200,000. Contrary to Lundy's assertion, we find that Question No. 8 was properly submitted as it related to Masson's fraud claim and, therefore, was not immaterial. Issue four is overruled.

### d. Punitive Damages Award

charged—*i.e.,* to permit the trial court to prevent or correct the error—applies equally here.

14. In his "Statement of Issues," Lundy frames issues six and seven as challenges to the legal and factual sufficiency of the evidence supporting the punitive damage award.

### (i) Sufficiency of the Evidence

In issues six and seven, Lundy contends that the evidence is insufficient to support the $500,000 in punitive damages awarded to Masson on his fraud claim. Lundy argues that the award should be set aside because (1) there is no evidence to support it, and (2) it is excessive under the circumstances.[14]

■ To award exemplary damages, the jury had to find by clear and convincing evidence that the harm to Masson resulted from malice or fraud. *See* TEX. CIV. PRAC. & REM.CODE § 41.003 (Vernon Supp.2006). A finding of intent to harm or conscious indifference to the rights of others will support an award of exemplary damages. *Spoljaric,* 708 S.W.2d at 436; *Trenholm v. Ratcliff,* 646 S.W.2d 927, 933 (Tex.1983). For a finding of malice to be sustained on appeal, legally sufficient evidence must show both that the act was likely to result in serious harm and that the defendant was consciously indifferent to the risk of harm. *KPH Consolidation, Inc. v. Romero,* 102 S.W.3d 135, 145 (Tex. App.-Houston [14th Dist.] 2003), *aff'd,* 166 S.W.3d 212 (Tex.2005). Evidence of malice is legally sufficient if, considered as a whole in the light most favorable to the prevailing party, it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

Question No. 3 of the Jury Charge defines malice as "a specific intent by Sean Lundy to cause substantial injury to Marcos Masson; *or* an act or omission by Sean Lundy, (i) which when viewed objectively

However, in his brief, he argues only that there is no evidence, *i.e.* legally insufficient evidence, and offers no argument challenging the factual sufficiency. Thus, we treat his evidentiary challenge as one to the legal sufficiency only.

from the standpoint of Sean Lundy at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (ii) of which Sean Lundy has actual, subjective awareness of the risk involved but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others."[15] Question 3 also properly included fraud as a ground for recovery of exemplary damages and accompanying definitions. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 110.33 (2006).

▇▇▇▇ Based on our review of the record, we conclude that there is legally sufficient evidence that Lundy acted in a manner involving an extreme degree of risk, namely, by deceiving Masson about the status of Byrne's patent. As a shareholder in ORI, Lundy participated in negotiating the terms of the agreement between Byrne and ORI and approved them and, thus, was aware that Byrne was legally entitled to request the reassignment of his patent from ORI. Byrne's testimony that Lundy refused to return his calls after he requested that ORI reassign the patent to him also supports the argument that Lundy was well aware of the risk of potential liability to Masson and financial impact to Global's sales but nevertheless· used Byrne's retractor technology with conscious indifference to the rights and welfare of Masson. Further, after reviewing the evidence in the Byrne litigation, Gerhardt concluded that malfeasance had occurred because "the intellectual property issues were not disclosed ... [t]hey weren't really fully discussed with the doctors." This was legally sufficient evidence from which the jury could reasonably infer that Lundy acted with malice thereby causing injury to Masson. *See Burleson*, 27 S.W.3d at 618–19 (finding evidence of malice where bank's loan officer, who understood relative placement of risk of loss between parties, failed to explain true nature and terms of construction loan to plaintiff contractor).

Lundy also argues that the award of exemplary damages to Masson is excessive under the circumstances. The jury awarded Masson actual damages in the amount of $500,000 based on his fraud claim and awarded him $500,000 in punitive damages. In support of his argument, Lundy simply states that "an award of twice the amount of actual damages under the circumstances is not a reasonable relationship [to the actual damage award]."[16]

---

**15.** Lundy contends that the second definition of malice in Question No. 3 was improper and not authorized by statute. His argument is without merit. Question No. 3 is based on PJC 110.33 which is the predicate question and instructions on an award of exemplary damages. PJC 110.33 is divided into parts A and B. PJC 110.33A, which includes the two definitions of malice as they appear in Question No. 3, applies to causes of action filed before September 1, 2003. PJC 110.33B, which consists solely of the first definition of malice, applies to actions filed on or after September 1, 2003. *See* Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 110.33 (2006). Masson filed his lawsuit on August 13, 2003, and, therefore, the definition of malice in Question No. 3 was proper. *See Dillard Dep't Stores, Inc. v. Silva*, 148 S.W.3d 370, 373 (Tex.2004) (per curiam) (applying two-part statutory definition of malice to case tried prior to 2003 amendment); *see also* Tex. Prac. & Civ. Rem. Code Ann. § 41.001(11) (recodification of subpart (B) of malice definition as definition of "gross negligence").

**16.** Contrary to Lundy's assertion, the jury's award of $500,000 in punitive damages to Masson is equal to the amount of actual damages awarded to Masson on his fraud claim.

Assuming that Lundy is challenging the constitutionality of the jury's findings of exemplary damages, we review the award *de novo* to ensure that exemplary damages are not "grossly disproportional" to the gravity of the defendant's conduct. *See Bunton v. Bentley*, 153 S.W.3d 50, 54 (Tex.2004) (citing *Cooper Indus. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 434–36, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001)). We consider (1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties awarded or imposed in other comparable cases. *Id.* (citing *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)). The most important of these considerations is the degree of reprehensibility of the defendant's misconduct. *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). To determine the degree of reprehensibility, we evaluate whether (1) the harm was physical or economic, (2) the conduct constituted an indifference to or reckless disregard of the health or safety of others, (3) the target of the conduct was financially vulnerable, (4) the conduct was a repeated or isolated event, and (5) the harm was the result of intentional malice, trickery, deceit or mere accident. *Id.*[17]

First, we consider the degree of reprehensibility of Lundy's conduct. There is no evidence that the harm to Masson was physical or that the harm showed a reckless disregard or indifference for Masson's health or safety or the health or safety of others. While Masson was not an overly financially vulnerable target, he invested significantly in Global's start-up with funds from his surgical practice as well as with personal resources and personally guaranteed a substantial line of credit. Further, as we have already noted, the evidence supports the jury's finding that Lundy deceived Masson by telling him that Byrne's patent was "not a problem" and "we can do whatever we want with it." While these statements were made only once, the deceit arguably continued as Global began manufacturing and selling its retractor using Byrne's technology.

We next consider the disparity between the actual or potential harm suffered by Masson and the punitive damages award. The United States Supreme Court has indicated that awards of exemplary damages that are less than four times the actual damages are well below the line of constitutional impropriety. *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513 (concluding that single-digit multipliers are more likely to comport with due process while still achieving goals of deterrence and retribution, than awards with ratios in range of 500 to 1). We note that the ratio between the actual damages awarded to Masson on his fraud claim and the award of exemplary damages is a 1 to 1 ratio. In light of the fact that the jury could have awarded Masson more than $1 million in exemplary damages, we find the award of $500,000 to be reasonable. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b);[18] *Springs Window*

17. We note that the factors enunciated in *Alamo National Bank v. Kraus*, which provide the framework for a factual sufficiency review of exemplary damages, are considerations encompassed within these principles. 616 S.W.2d 908 (Tex.1981); *see Huynh v. Phung*, No. 01–04–00267–CV, 2007 WL 495023, at *10 n. 8 (Tex.App.-Houston [1st Dist.] Feb. 16, 2007, no pet.) (mem.op.) (citing *Kraus* factors).

18. Subsection (b) provides as follows:

*Fashions Division, Inc. v. Blind Maker, Inc.,* 184 S.W.3d 840, 891 (Tex.App.-Austin 2006, pet. granted, judgm't vacated w.r.m.) (finding award of exemplary damages of $2,090,000 reasonable where civil practice and remedies code would permit award of more than $2.5 million). We conclude that the award of exemplary damages against Lundy is not unconstitutionally excessive. Issues six and seven are overruled.

### (ii) Jury Charge

In issue eight, Lundy contends the punitive damages question and instructions were defective. Specifically, he argues that they were improper because (1) the question did not provide for a finding regarding the two theories of fraud or malice, (2) the question gave an improper definition of malice, and (3) the instruction allowed the jury to consider Lundy's net worth despite no evidence of net worth being submitted to the jury.

Lundy first argues that because Masson's fraud claim was based on two factual theories, the punitive damages question submitted to the jury should have consisted of three separate possibilities: fraud based on Lundy's job interview, fraud based on Byrne's patent, and malice. PJC 110.33—the predicate question and instruction on an award of exemplary damages—asks "Do you find by clear and convincing evidence that the harm to [plaintiff] resulted from [*malice* or *fraud*]?" Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 110.33 (2006). It then provides definitions for "clear and convincing evidence" and "malice" and concludes with the following parenthetical: "[*and/or use*

appropriate definition for "fraud"; see comment below, "Fraud as a ground for exemplary damages."]." *Id.* Question 3 of the jury charge mirrors PJC 110.33 and asks "Do you find by clear and convincing evidence that the harm to Marcos Masson resulted from malice or fraud?" It then provides definitions for malice and fraud.

■ In support of his argument, Lundy cites to *Crown Life Insurance Co. v. Casteel,* 22 S.W.3d 378 (Tex.2000) and *Harris County v. Smith,* 96 S.W.3d 230 (Tex.2002). Lundy's reliance on these cases is misplaced. In *Casteel,* the Texas Supreme Court held that "[w]hen a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding." 22 S.W.3d at 389. In *Smith,* the Court applied its reasoning in *Casteel* to a jury charge which mixed valid and invalid elements of damages in a single broad-form submission. 96 S.W.3d at 233–34 (holding trial court erred in overruling timely and specific objection to the charge, which mixed valid and invalid elements of damages in a single broad-form submission, and that such error was harmful because it prevented appellate court from determining whether jury based its verdict on improperly submitted invalid element of damage). The court opined that submitting separate questions on theories of liability and elements of damage might avoid a finding of harmful error if the appellate court finds that one or more, but not all, theories or

---

(b) Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:

(1)(A) two times the amount of economic damages; plus

(B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or

(2) $200,000.

TEX CIV. PRAC. & REM.CODE ANN. § 41.008(b).

elements lack legal or evidentiary support. *See id.* at 235.

■ Here, however, Lundy is not complaining that the jury charge contains an invalid theory of liability or invalid elements of damages. Rather, he argues that the jury should have been required to specify the basis for its award of punitive damages. Texas law contains no such requirement. *See Texas Dep't of Human Servs.*, 802 S.W.2d at 649 (holding trial court is not required to ask jury to specify ground on which it relied to answer question in jury charge).[19]

Lundy next contends that the malice definition in Question 3 was improperly expanded in violation of section 41.001(7) of the Civil Practice and Remedies Code. Lundy makes this same assertion in issues six and seven. Having previously addressed this argument and found it to be without merit, we need not do so again here.

■ Lundy also argues that the punitive damages instruction was defective because it allowed the jury to consider his net worth although no such evidence was submitted. A review of the record reveals that Lundy earned $100,000 a year while at Knowledge, Inc. and "had a deal where over a three-year period I got what amounted to about almost $300,000 a year in stock options." At Global, he earned $200,000 a year and had a 20% ownership interest in the company. At the time of trial, Lundy ran Henry's solo practice and earned $200,000. This constitutes some evidence of Lundy's net worth that the jury could have considered in answering the punitive damages question. Issue eight is overruled.

## 2. Global

In issues fourteen and fifteen, Lundy contends the evidence is legally and factually insufficient to support the jury's finding in favor of Global on the fraud issue. The jury found that Lundy's actions damaged Global's business operations and awarded Global $100,000 for waste of inventory.

In support of the fraud finding, Global argues that Lundy failed and refused to (1) keep Global's owners, shareholders, and principals informed of Global's financial state, (2) disclose that he neglected to properly store and maintain Global's inventory in sterile condition, (3) properly record certain liabilities of Global thereby manipulating the financial books and records of the company, (4) correctly represent certain financial projections in Global's private placement memorandum, (5) disclose that Lundy unilaterally ceased work at Global and vacated the premises to perform services at Houston Hand, (6) disclose that Lundy did not have experience in international outsourcing, (7) properly record and account for a $75,000 promissory note that he owed to Global and then subsequently lied about its existence, (8) disclose that he did not have any experience managing payroll functions, (9) disclose that Lundy intended to defraud Byrne by converting his intellectual property, (10) disclose that he had no experience setting up a manufacturing process, (11) disclose that ORI had failed, (12) disclose that his prior job was as a photographer, not a Wall Street professional, as he had represented to Masson, and (13) disclose that he had been sued by his father-in-law in a prior business venture.

■ The jury found in favor of Global on its fraud claim. In Question No. 14, the charge asked the jury to consider the following elements in awarding damages:

---

19. We also note that Lundy did not object to the charge on this basis and, in not doing so, failed to preserve error. *See* TEX.R.APP. P. 33.1.

"(1) Global's investment and cost to develop and market the Magellan Retractor Device. (2) Money advanced to Sean Lundy to purchase his house. (3) Damage to Global's business operations by waste of inventory." The jury did not award any damages for the first two elements and awarded $100,000 in damages for waste of inventory. Of the allegations enumerated above, Global's contention that Lundy failed to disclose that he had neglected to properly store and maintain Global's inventory in sterile condition appears to be the basis upon which the jury based its damages award. However, we do not find that the evidence supports such a finding.

■ In examining the circumstances surrounding this allegation, we note that the entity concerned here is a corporation. "A corporation can act and acquire knowledge only through its agents." *Poth v. Small, Craig & Werkenthin, L.L.P.*, 967 S.W.2d 511, 515 (Tex. App.-Austin 1998, pet. denied) (citing *Hirsch v. Texas Lawyers' Ins. Exch.*, 808 S.W.2d 561, 563 (Tex.App.-El Paso 1991, writ denied)). "Knowledge held by corporate officers or directors may be imputed to the corporation itself." *Id.* (citing *Hirsch*, 808 S.W.2d at 563). Burks testified that, in 2003, she learned from Steritec that Global's original contract for sterilization had expired and that Global would have to complete a sterilization re-validation before Steritec would resume sterilization of its products.[20] At that time, one of Global's products was in quarantine awaiting sterilization. Burks testified that when she told Lundy about the issue, he would not authorize the re-validation. Consequently, neither the product in quarantine nor subsequent products were sterilized. Thus, as an officer of Global, Burks was aware that some of Global's inventory was not sterilized and, without a re-validation, future products would not be sterilized. As such, Lundy cannot be held liable for failing to disclose a fact the company knew through one of its officers. *See id.* at 515.[21]

We conclude the evidence is legally and factually insufficient to support a finding of fraud as to Global. Issues fourteen and fifteen are sustained. In light of our disposition of these issues, issues sixteen through eighteen—related to the punitive damages awarded to Global on its fraud cause of action—are moot.

## B. Breach of Fiduciary Duty

■ The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach. *See Jones v. Blume*, 196 S.W.3d 440, 447 (Tex.App.-Dallas 2006, pet. denied); *Punts v. Wilson*, 137 S.W.3d 889, 891 (Tex.App.-Texarkana 2004, no pet.). Due to its extraordinary nature, the law does not recognize a fiduciary relationship lightly. *See Willis v. Donnelly*, 199 S.W.3d 262, 278 (Tex.2006); *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex.App.-Houston [14th Dist.] 1997, pet. denied). Whether such a duty exists depends on the circumstances. *Hoggett*, 971 S.W.2d at 488.

■ A fiduciary relationship may arise from formal and informal relationships and may be created by contract.

20. Steritec was the company Global contracted with for sterilization of its products.

21. Because the jury awarded damages solely for waste of inventory and found no other loss to Global, the remaining allegations do not support the jury's finding.

*Cotten v. Weatherford Bancshares, Inc.,* 187 S.W.3d 687, 698 (Tex.App.-Fort Worth 2006, pet. denied). Fiduciary duties arise as a matter of law in certain formal relationships, including attorney-client and trustee relationships. *Meyer v. Cathey,* 167 S.W.3d 327, 330 (Tex.2005). In contrast, an informal fiduciary duty may arise from a moral, social, domestic, or purely personal relationship of trust and confidence. *Id.; Cotten,* 187 S.W.3d at 698. Such a confidential relationship exists where influence has been acquired and abused and confidence has been extended and betrayed. *Cotten,* 187 S.W.3d at 698. To impose an informal fiduciary duty, the relationship of trust and confidence must exist prior to, and apart from, the agreement that is the basis of the suit. *Id.* The existence of a confidential relationship is ordinarily a question of fact for the jury. *Id.*

### 1. Masson

#### a. Cause of Action

In issues nine and ten, Lundy contends the evidence is legally and factually insufficient to support the breach of fiduciary findings against him in favor of Masson and Global. Specifically, Lundy argues that the evidence is insufficient to show (1) the existence of a fiduciary relationship, (2) assuming a duty existed, a breach of duty, and (3) a transaction between Lundy and Masson.

#### (i) Duty

Lundy argues that, absent evidence of a formal relationship, Masson must show that an informal confidential relationship existed between them.[22] He concludes

> [h]owever, this is impossible because to impose an informal fiduciary duty in a business transaction, the special rela-

tionship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit. In other words, there must be a preexisting special relationship of trust and confidence which is betrayed in later dealings, and in short, there is no fiduciary relationship as a matter of law that predates the contract between the parties.

Although Lundy frames the issue as a challenge to both the legal and factual sufficiency of the evidence in his brief, the entirety of his argument, as demonstrated above, is that there is no evidence of a prior confidential relationship. Therefore, we limit our review to determine the legal sufficiency of the evidence. *See San Antonio Props., L.P. v. PSRA Invs., Inc.,* 255 S.W.3d 255, 259 (Tex.App.-San Antonio 2008, no pet. h.) (noting that although appellant's brief stated issue as legal and factual sufficiency challenge, substance of argument was one of "no evidence" requiring legal sufficiency review only).

■ Question No. 5 of the jury charge asked, "Did a relationship of trust and confidence exist between Sean Lundy and Marcos Masson?" The question instructed the jury that "[a] relationship of trust and confidence existed if Marcos Masson justifiably placed trust and confidence in Sean Lundy to act in Marcos Masson's best interest. Marcos Masson's subjective trust and feelings alone do not justify transforming arm's-length dealings into a relationship of trust and confidence." However, the question did not include an instruction that the relationship had to exist prior to, and separate from, the agreement made the basis of the suit. A review of the record further reveals that Lundy did not tender to the trial court an

---

**22.** We agree, and appellees do not dispute, that there is no evidence of a formal relation- ship between Lundy and Masson.

alternative written instruction informing the jury that a prior and separate relationship is required or otherwise object to the omission of such an instruction.[23] As such, he failed to preserve his argument that there must be evidence of a pre-existing relationship. *See* Tex.R. Civ. P. 278 ("Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment."); *W. Reserve Life Assur. Co. v. Graben*, 233 S.W.3d 360, 373 (Tex.App.-Fort Worth 2007, no pet.) (holding appellants waived argument that prior and separate relationship must exist to impose informal relationship where appellants failed to provide trial court with alternative written instruction containing such language); *Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 602–03 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (concluding appellant does not preserve issue of omitted instruction or question for appellate review unless appellant tenders written request to trial court for submission of question or instruction in "substantially correct wording").

Other than asserting that "there is no fiduciary relationship as a matter of law that predates the contract between the parties," Lundy offers no argument or analysis whatsoever explaining why the evidence of the parties' relationship and interactions is insufficient to give rise to an informal fiduciary duty. Where a party fails to support an issue with argument, he waives any error on appeal. *Happy Harbor Methodist Home, Inc. v. Cowins*, 903 S.W.2d 884, 886 (Tex.App.-Houston [1st Dist.] 1995, no writ) ("[Appellant] does not provide us with argument that is sufficient to make its appellate complaint viable, and we will not perform an independent review of the record and applicable law to determine whether the error complained of occurred."); *see also Bankhead v. Maddox*, 135 S.W.3d 162, 163–64 (Tex.App.-Tyler 2004, no pet.) ("In its review of a civil matter, an appellate court has no discretion to fabricate an issue not raised in the appellant's brief...."). Moreover, he cites to no authority nor directs us to any relevant facts to support a sufficiency contention. A party's failure to cite any authority to support its contention on appeal itself waives the contention. *Cowins*, 903 S.W.2d at 886. We are not required to do the job of the advocate. *Id.* As such, Lundy has waived this issue.

### (ii) Breach

Lundy next contends that, assuming a fiduciary duty existed, there is no evidence that he breached his duty to Masson. Question No. 6, which mirrors PJC 104.2, instructed the jury that to prove that he complied with his duty, Lundy had to show: (1) the transactions in question were fair and equitable to Masson, (2) he made reasonable use of the confidence that Masson placed in him, (3) he acted in the utmost good faith and exercised the most scrupulous honesty toward Masson, (4) he placed the interests of Masson before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Masson, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary, and (5) he fully and fairly

---

**23.** Lundy's objection to the question on fiduciary duty was as follows:

Counsel: Regarding Question No. 5, the only evidence that was introduced in the record regarding any fiduciary duty was Sean Lundy—Sean Lundy's fiduciary duty to the corporation. There was no evidence at all of a fiduciary duty from Sean Lundy running to Dr. Masson. Therefore, that instruction should not be given. No other objection to Question 5.

Court: Objection is overruled.

disclosed all important information to Masson concerning their transactions.

A review of the record reveals some evidence that Lundy did not make reasonable use of the confidence that Masson placed in him and that he did not act in the utmost good faith and exercise the most scrupulous honesty toward Masson. Masson testified that Lundy persuaded him to secure a $1 million line of credit to "grow the company," for which Masson was later held liable. Based on Lundy's recommendation, Masson loaned $450,000 of his own money to Global, which was never repaid notwithstanding Lundy's assurances to the contrary. Masson also testified that Lundy and Henry transferred approximately $700,000 from Houston Hand to Global without Masson's knowledge or approval. Moreover, Lundy was dishonest with Masson when he told him that Byrne's patent was "no problem."

The testimony of Masson, Reichek, and Burks demonstrate that Lundy failed to fully and fairly disclose important information to Masson. Masson testified that Lundy routinely failed to provide him with the company's financial information or access to financial records, despite Masson's requests. On cross-examination, Lundy admitted that he did not regularly provide Masson with written operating or sales reports. Reichek, Global's controller, also testified that Lundy forbade her from providing Masson with any financial information, and that if she continued to do so, she would lose her job. Burks also testified that when she told Lundy that Masson had asked her for financial information, Lundy replied that Masson should ask him, not her, for the information. Burks further

testified that Masson had told her that when he had asked Lundy to provide him with financial information on several occasions, Lundy was not forthcoming.[24]

Lundy also contends that because the jury charge does not refer to any particular transaction in which he supposedly breached his duty to Masson, Masson's breach of duty claim fails. Lundy cites no authority to support his argument, nor are we are of any. As such, he has waived this argument. *See Cowins,* 903 S.W.2d at 886.

Anything more than scintilla of evidence is legally sufficient to support the jury's finding that Lundy breached his fiduciary duty to Masson. *See Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex. 1996); *W. Reserve Life Assur. Co.,* 233 S.W.3d at 375. We find that the foregoing constitutes more than a scintilla of evidence that Lundy breached his duty to Masson. Further, we conclude that the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We therefore hold that the evidence was legally and factually sufficient to support the jury's verdict. Issues nine and ten are overruled.

### b. Jury Charge

In issues eleven and twelve, Lundy contends that the breach of fiduciary duty submission in the jury charge was defective as to Masson on two grounds. First, the burden to prove a breach of fiduciary duty was improperly placed on Lundy. Second, the charge gave no guidance to the jury as to which transaction he supposedly breached his duty.

---

**24.** Lundy begins this section by stating, "[a]ssuming the establishment of a fiduciary duty is overcome, Dr. Masson cites to no facts whatsoever that he [Lundy] breached his duty to Dr. Masson." However, Lundy points to no relevant facts to support his position. Instead, he appears only to re-urge his argument that he did not owe a duty to Masson. *See Cowins,* 903 S.W.2d at 886.

■ Lundy argues that Masson had the burden to prove that Lundy breached his fiduciary duty to him, and that Question No. 6 improperly placed the burden on Lundy to prove he complied with his duty.[25] This argument is misplaced. Texas courts apply a rebuttable presumption of unfairness to transactions between a fiduciary and a party to whom he owes a duty of disclosure. *Lee v. Hasson,* No. 14–05–00004–CV, — S.W.3d —, —, 2007 WL 236899, at *15 (Tex.App.-Houston [14th Dist.] Jan. 30, 2007, pet. denied); *Collins v. Smith,* 53 S.W.3d 832, 840 (Tex. App.-Houston [1st Dist.] 2001, no pet.). Thus, the profiting fiduciary bears the burden of showing the fairness of the transactions. *See Tex. Bank & Trust Co. v. Moore,* 595 S.W.2d 502, 508–09 (Tex.1980); *Lee,* — S.W.3d at —, 2007 WL 236899, at *15; *Collins,* 53 S.W.3d at 840. The trial court did not misplace the burden of proof.[26] Issue eleven is overrruled.

Lundy also argues that the breach of fiduciary duty submission was defective because it gave no guidance to the jury as to which transaction he supposedly breached his duty. Because we previously found that Lundy waived this argument, we need not address it again here. Issue twelve is overruled.

### c. Election of Remedies

In issue thirteen, Lundy asserts that Masson should have been required to elect between damages awarded on his fraud and breach of fiduciary duty causes of action. He argues that because the facts asserted to prove fraud are the same facts asserted to prove breach of fiduciary duty, the trial court should have required Masson to elect between the damages and erred in entering judgment on both awards.

■ The single recovery, or one satisfaction rule, is a rule of general acceptance that an injured party is entitled to one satisfaction for sustained injuries. *See Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 7 (Tex.1991). If a plaintiff pleads alternate theories of liability, a judgment awarding damages on each alternate theory may be upheld if the theories depend on separate and distinct injuries and if separate and distinct damages findings are made as to each theory. *See Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 367 (Tex.1987). However, a party who seeks redress under two or more theories of recovery for a single wrong must elect, before the judgment is rendered, under which remedy he wishes the court to enter a judgment. *Star Houston, Inc. v. Shevack,* 886 S.W.2d 414, 422 (Tex.App.-Houston [1st Dist.] 1994), *writ denied per curiam,* 907 S.W.2d 452 (Tex.1995); *American Baler Co. v. SRS*

---

**25.** Question No. 6 instructed the jury as follows:

Did Sean Lundy comply with his fiduciary duty to Marcos Masson?
To prove he complied with his duty, Sean Lundy must show:
1. the transactions in question were fair and equitable to Marcos Masson;
2. Sean Lundy made reasonable use of the confidence that Marcos Masson placed in him;
3. Sean Lundy acted in the utmost good faith and exercised the most scrupulous honesty toward Marcos Masson;

4. Sean Lundy placed the interests of Masson before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Masson, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and
5. Sean Lundy fully and fairly disclosed all important information to Marcos Masson concerning the transactions.

**26.** We note that Lundy does not contend that he rebutted the presumption and, therefore, we need not consider this argument.

*Sys., Inc.,* 748 S.W.2d 243, 246 (Tex.App.-Houston [1st Dist.] 1988, writ denied). But where the prevailing party fails to make that election, the trial court should use the findings affording the greater recovery and render judgment accordingly. *Birchfield,* 747 S.W.2d at 367. If the trial court fails to do so, the appellate court will reform the trial court's judgment to effect such an election. *Star Houston,* 886 S.W.2d at 423; *American Baler Co.,* 748 S.W.2d at 246, 250.

▋ A review of the record reveals that Masson did not attempt to distinguish between the damages he suffered as a result of Lundy's fraud and breach of fiduciary duty. Rather, he presented evidence of his damages generally, focusing in particular on his $450,000 loan to Global, the $1 million line of credit which he personally guaranteed and for which he was later sued, and Houston Hand's numerous cash loans to Global totaling over $670,000.

▋ Further, Masson submitted identical damage questions after both liability questions in the jury charge. The jury was instructed to consider the following elements of damages for fraud and breach of fiduciary duty: (1) Masson's out-of-pocket loans to Global and (2) damage to Masson's credit reputation sustained in the past, and in reasonable probability, he will sustain in the future as a result of his guarantee of the Bank of America loan. *See Madison v. Williamson,* 241 S.W.3d 145, 159 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) (holding trial court properly concluded plaintiff's claims resulted in single, indivisible injury where plaintiff did not attempt to distinguish between damages suffered and submitted identical damage questions after each liability question in jury charge); *Household Credit Svcs., Inc. v. Driscol,* 989 S.W.2d 72, 80 (Tex. App.-El Paso 1998, pet. denied). Moreover, the fact that the jury awarded different amounts under the two theories does not preclude application of the doctrine. The one satisfaction rule may limit a plaintiff's recovery even where the amounts awarded vary from claim to claim. *See Driscol,* 989 S.W.2d at 80.

We also find that Masson's fraud and breach of fiduciary duty claims are based on the same acts or omissions. Throughout the record and in appellees' brief, Masson refers to the same acts and omissions by Lundy as evidence that Lundy committed fraud and breach of fiduciary duty. *See Spethmann v. Anderson,* 171 S.W.3d 680, 694 (Tex.App.-Dallas 2005, no pet.) (concluding trial court should have required plaintiff to elect between awards of damages against defendant for fraud and breach of fiduciary duty where formula for calculating damages was same for both theories and both involved same conduct). Moreover, in closing arguments, Masson's counsel stated, "You're asked two different questions, one about fraud, one about breach of fiduciary duty. There are just two different theories of liability. *The same evidence really generally supports both,* and you—they aren't dependent on each other." (emphasis added).

Accordingly, we sustain issue thirteen and find that Masson may recover on only one of his theories of recovery. When, as in this case, the plaintiff establishes separate theories of liability based on the same facts and fails to elect between more than one recovery, the appellate court should render judgment on the finding affording the greatest recovery. *See Star Houston,* 886 S.W.2d at 423; *Murphy v. Seabarge, Ltd.,* 868 S.W.2d 929, 938 (Tex.App.-Houston [14th Dist.] 1994, writ denied). We hold that the trial court should have applied the election of remedies rule and limited Masson's recovery to the damages awarded for his fraud claim because the

fraud award afforded the greatest recovery. Issue thirteen is sustained.

### 2. Global

### a. Cause of Action

In issues nineteen and twenty, Lundy contends that the evidence is legally and factually insufficient to support the jury's verdict in favor of Global on its breach of fiduciary duty claim.

### *(i) Duty*

■ In his Supplemental Brief, Lundy contends that we must determine what duties, if any, a non-managing member owes to a managing member or to the LLC itself.[27] In support of his contention, Lundy asserts that "[p]art of the appellant's complaint in this appeal is that the jury was instructed that the appellant in fact had a fiduciary duty." He then directs us to the arguments raised in his Original Brief under issues eleven, twelve, twenty-one, and twenty-two, which address the jury submissions on the breach of fiduciary duty claims. However, a close examination of these arguments reveals that they focus solely on whether (1) there was evidence of a *breach*, not a duty, (2) appellees were required to identify the particular transaction at issue, and (3) the burden of proof on the breach of fiduciary duty claims was improperly shifted to Lundy. In short, Lundy appears to argue, for the first time in this appeal, that the trial court erred in instructing the jury that appellant had a fiduciary duty to Global as a matter of law rather than submitting a jury question.

To argue on appeal that the trial court erred in instructing the jury that a fiduciary duty existed because it is a fact question, an appellant has to have objected to

the charge on that ground, or at least in a manner sufficient to alert the trial court that the existence of a fiduciary relationship was a fact question for the jury. *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992) (concluding test is whether party made trial court aware of complaint, timely and plainly, and obtained ruling). Lundy's counsel objected to Question No. 9—"Did Sean Lundy comply with his fiduciary duty to Global?"—as follows: "Regarding Question No. 9, there is no evidence to—the only way that you can have a breach of fiduciary duty with respect to a corporation is to allege a breach of a duty of obedience, a breach of a duty of loyalty, or a breach of duty of care. Global has never specified which of these duties it's talking about in its pleadings, nor in its evidence introduced at trial. They didn't introduce any evidence of the *breach* of fiduciary duty ...." (emphasis added). His counsel's objection is aimed solely at the question of a breach, not a duty. It is also worth noting that in his objection to Question No. 5—"Did a relationship of trust and confidence exist between Lundy and Masson?"—Lundy's counsel argued that *"the only evidence that was introduced in the record regarding any fiduciary duty was Sean Lundy–Sean Lundy's fiduciary duty to the corporation.* There was no evidence at all of a fiduciary duty from Sean Lundy running to Dr. Masson" (emphasis added). Thus, not only did Lundy not object to the trial court's instruction that Lundy owed a fiduciary duty to Global, he also acknowledged that there was some evidence presented that Lundy owed a duty to Global. *See Hazlewood Patterson Co. v. Hancock*, No. 10–03–00274–CV, 2004 WL 2903861, at *5 (Tex.App.-Waco Dec. 15, 2004, pet. denied) (mem.op.) (hold-

---

**27.** Formed in July 2001 as a limited liability corporation, Global was converted to a corpo-

ration in May 2003.

ing issue whether trial court's instruction that defendants owed plaintiffs fiduciary duty was error was not preserved for appeal where defendants objected only on no evidence ground rather than objecting to instruction itself).[28] As such, Lundy failed to preserve error on this ground.

### (ii) Breach

In his Original Brief, Lundy claims that Global's claim was based solely on a breach of the duty of loyalty and the evidence is insufficient to support a finding of a breach of that duty. He also argues that the jury's finding of a breach fails because Global did not specify the transaction or corporate opportunity Lundy allegedly usurped.

Question No. 6 of the charge instructed the jury as follows:

As an officer of Global, Sean Lundy owed the company a fiduciary duty. To prove he complied with his duty, Sean Lundy must show:

a. the transactions in question were fair and equitable to Global;

b. Sean Lundy made reasonable use of the confidence that Global placed in him;

c. Sean Lundy acted in the utmost good faith and exercised the most scrupulous honesty toward Global;

d. Sean Lundy placed the interests of Global before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Global, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and

e. Sean Lundy fully and fairly disclosed all important information to Global concerning the transactions.

■ A review of the record reveals ample evidence to support the jury's findings that Lundy breached his duties to Global. Gerhardt testified that Global could no longer be run due to the problems caused by Lundy's malfeasance. Global's main initial product that it manufactured, marketed, and sold was based on retractor technology that belonged to Byrne. Byrne later sued Global, along with Masson, for among other things, conversion, arising from Global's use of Byrne's patent technology. The evidence shows that Lundy manipulated the company's books by not properly recording certain liabilities which adversely affected decision-making at the company. Gerhardt also testified that certain financial projections in the private placement memorandum prepared by Lun-

**28.** In *Willis v. Donnelly*, 118 S.W.3d 10 (Tex. App.-Houston [14th Dist.] 2003), *aff'd in part*, 199 S.W.3d 262 (Tex.2006), the Willises argued that the trial court erred in instructing the jury that a fiduciary relationship existed, objecting as follows: "Plaintiffs would object to Question No. 22 in that there is no evidence to support submission of the issue ... [and] because as *a matter of law*, Mike Willis owes no fiduciary duty to Dan Donnelly" (emphasis added). *Id.* at 33. We concluded that appellants' objections were insufficient to alert the trial court that existence of a fiduciary relationship was a fact question for the jury. *Id.* at 34. We held that, to preserve error, the Willises were required to object that the question was omitted. *Id.* On review, however, the Texas Supreme Court concluded that the Willises had preserved error based on their objections that the breach of fiduciary claim should fail as a matter of law because there was no evidence of a shareholder relationship or any other legally recognized basis for such a duty and because Willis was never a shareholder. *Willis v. Donnelly*, 199 S.W.3d 262, 276 n. 28 (Tex.2006). The present case is factually distinguishable because Lundy objected to Question No. 9 solely on the basis that there was no evidence of a breach, not a duty, and conceded that there was evidence introduced of a fiduciary duty owed by Lundy to Global in his objections to Question No. 5. Moreover, whether a fiduciary duty exists is a question of law. *Meyer*, 167 S.W.3d at 330.

dy and issued to outside investors were "grossly misleading." In late 2002, Lundy ceased working at Global for approximately ten months to "clean the books" that were supposedly left in a mess by Reichek. Gerhardt testified that once Lundy left Global, "[t]he sales really dropped. There were no sales." In May 2003, Lundy executed a full-time employment agreement with Houston Hand although he was supposed to be working full-time as Global's President and CEO. Lundy failed to properly record and account for the $75,000 promissory note he owed to Global. There was also evidence that he failed to keep Global's owners and officers informed of Global's financial condition.

In support of his argument that the evidence is insufficient to support a finding that he breached his duty to Global, Lundy contends that the jury charge does not identify which transaction he supposedly took advantage of. He then states that "[t]he breach stated in Global's pleadings, even if supported by the evidence, is not, as a matter of law, an adequate basis to sustain a breach of loyalty finding. This is because, as alleged in Global's pleadings, 'cooking the books,' and 'false private placement,' even if true, was, according to Global's pleadings, intended to help, not hurt Global." This argument is without merit. Lundy cites no authority to support his argument that the charge submission must isolate a particular transaction, nor are we aware of any.[29] As such, this argument is waived. Moreover, we find

nothing in the record to support Lundy's assertion that Global considered his falsifying of its financial records and inaccurate private placement memorandum as an attempt "to help, not hurt" Global.[30]

We conclude that there is more than a scintilla of evidence to support the jury's finding that Lundy breached his fiduciary duty to Global. We also conclude that the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's verdict. We overrule issues nineteen and twenty.

### b. Jury Charge

In issue twenty-one, Lundy contends that the form of Global's breach of fiduciary claim was defective because it should have identified the particular transaction in question, and then required the jury to determine whether the transaction was fair. As previously discussed, Lundy waived this argument and, therefore, we do not address it again here. Issue twenty-one is overruled.

In issue twenty-two, Lundy contends that the jury charge form of Global's breach of fiduciary claim improperly shifted the burden of proof to Lundy. However, as discussed above, a rebuttable presumption of unfairness is applied to transactions between a fiduciary and a party to whom he owes a duty of disclo-

**29.** In addition to the absence of authority supporting such a proposition, we note that PJC 104.2 refers to "the transaction(s)," without suggesting a preliminary question identifying the particular transaction. *See* Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 104.2 (2006).

**30.** In its First Amended Cross–Claims, Global alleged that "Lundy had effectively cooked the books so as to inaccurately reflect the financial condition of the company" and "made false representations and used false data to produce private placement offering memorandums which he was using to obtain other investors to make loans and advances." These allegations can hardly be characterized as an acknowledgment by Global that Lundy's actions were well-intentioned.

sure. *Lee,* —— S.W.3d at ——, 2007 WL 236899, at \*15; *Collins,* 53 S.W.3d at 840. Thus, the profiting fiduciary has the burden of demonstrating the fairness of the transactions. *See Tex. Bank & Trust Co.,* 595 S.W.2d at 508–09; *Lee,* —— S.W.3d at ——, 2007 WL 236899, at \*15.[31] We overrule issue twenty-two.

### c. Election of Remedies

In issue twenty-three, Lundy asserts that Global should have been required to elect between the damages awarded for its fraud and breach of fiduciary duty causes of action because the same facts underlie both theories. Because we held above that there is insufficient evidence to support the fraud finding in favor of Global, there is no election to be made. Issue twenty-three is overruled.

## IV. CONCLUSION

We affirm the trial court's judgment in favor of Masson on his fraud and breach of fiduciary duty claims. However, we apply the election of remedies rule and reform the judgment to reflect that Masson's recovery is limited to the damages awarded for his fraud claim and affirm the judgment as reformed. We affirm the trial court's judgment in favor of Global on its breach of fiduciary duty claim. We reverse and render that portion of the judgment in favor of Global on its fraud claim.

---

**31.** Lundy does not contend that he rebutted the presumption. Thus, we do not consider that argument here.