Affirmed as Modified and Memorandum Opinion filed December 15, 2009.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00534-CV

___________________

 

LJ Charter, L.L.C., Charles N. Schwarz, Jr.,
Charles N. Schwarz, III, and CNS Ventures, L.L.C., Appellants

 

V.

 

Air America Jet Charter, Inc.,
Appellee



 



 

On
Appeal from the 165th District Court

Harris County,
Texas



Trial Court Cause No. 2004-33390

 



 

 

MEMORANDUM OPINION

            This case involves a commercial dispute over the use
of a hangar at the City of Houston’s Hobby Airport.  The trial court entered a
judgment in favor of appellee and cross-appellant, Air America Jet Charter,
Inc. (“Air America”), which both sides challenge on appeal.  We modify the
trial court’s judgment and affirm as modified.

Factual and
Procedural Background

            Appellant and
cross-appellee LJ Charter, L.L.C. (“LJ Charter”) is owned by appellants and
cross-appellees Charles N. “Buzzy” Schwarz, Jr. (“Buzzy Schwarz”) and Charles
N. “Trey” Schwarz, III (“Trey Schwarz”).[1] 
LJ Charter was a private aircraft management company that held a valuable
asset: a lease from the City of Houston (“City”) on a “135” hangar (located on
Larson Street and it will be referred to as either the “Larson Street Hangar”
or just the “Hangar”) located at Hobby Airport.[2] 
LJ Charter’s lease ran through December, 2000.  Under City requirements, to
lease a 135 hangar such as the Larson Street Hangar, the lessee had to hold a
135 certificate from the Federal Aviation Administration (“FAA”).  A 135
certificate is the license that enables an entity to engage in the business of
chartering private aircraft.  A 135 certificate lists the specific types of
aircraft the FAA has determined the entity has the capability to safely fly. 
LJ Charter owned two aircraft: a Learjet and a King Air 90, but it did not
possess a 135 certificate.  Prior to the events directly at issue in this
litigation, LJ Charter had avoided the City’s requirement that the Hangar
lessee hold a 135 certificate by bringing a company into the Hangar that did
have a 135 certificate.[3] 
For reasons not disclosed in the record, that relationship ended and LJ Charter
faced the prospect of losing the Larson Street Hangar if it did not find a
replacement.  After lengthy negotiations with another charter company fell
through, LJ Charter approached Air America.

            Air America is a
small charter company owned by Blair McCarter, Jr.  It held a 135 certificate
from the FAA.  Air America also operated two planes (a Learjet and a Navajo,
both leased from another company owned by McCarter) and was operating out of
another hangar at Hobby Airport operated by Fletcher Aviation.  One
disadvantage of operating out of the Fletcher Hangar was Air America had to pay
close to retail prices for its aviation fuel.  In the summer/fall of 2000, LJ
Charter and Air America entered into discussions over Air America moving into
the Larson Street Hangar.  Aware that LJ Charter’s lease ended in December 2000,
McCarter expressed a lack of interest in moving into the new hangar only to
face the prospect of moving again a short time later.  LJ Charter convinced
McCarter that the move would be a good thing for both parties because (1) the
Larson Street Hangar had a tank farm and therefore Air America would be able to
obtain its aviation fuel for wholesale rather than retail prices; (2) the
Schwarzes represented they knew a lot of people in the “business” and could
bring additional aircraft into the Larson Street Hangar,[4] which would then
be available for Air America to charter; and (3) they had connections with the
City and were working on extending the lease into the future.  The sales pitch
was successful and ultimately, on October 14, 2000, the two companies entered
into the “Charter Aircraft Services Management Agreement” (the “Agreement”). 
Included in the Agreement was Exhibit “A” setting forth additional obligations
under the Agreement.  Paragraph 7 of Exhibit “A” provides:

If at any time during the term of this Agreement, [LJ
Charter] should (for any reason whatsoever) not want [Air America] in it’s
Hangar, [LJ Charter] will pay $25,000.00 to [Air America] for a relocation fee,
provided there are no Hangar sales pending as stated above in Paragraph six
(6).[5]

            To help get the
City’s approval of the new relationship and thereby keep LJ Charter in control
of the valuable Larson Street Hangar, John Weatherly, LJ Charter’s attorney,
drafted a letter to the Houston Airport Systems’ Properties Division.  In that
letter, Weatherly wrote: “in an effort to comply with what we believe to be the
City’s request, my clients have structured a business arrangement with Air
America Charter, Inc. (“Air America”) concerning the operation of the Leased
Premises.  Specifically, L.J. Charter and Air America have entered into a Joint
Venture Charter Aircraft Services Management Agreement (the “Joint Venture
Agreement”) concerning operation of the Leased Premises.”

            The relationship
between the two companies was rocky from the beginning.  First, the LJ Charter
King Air 90 was not airworthy and was unavailable for charters during the
entire time period the two companies shared the Hangar.  Next, LJ Charter did
not live up to all of the duties it was supposed to fulfill under the terms of
the Agreement.  These included arranging fuel deliveries, maintaining the
facility and the equipment, and paying half of the various expenses.  In
addition, LJ Charter did not bring additional aircraft into the Hangar.  Finally,
the LJ Charter Learjet began experiencing mechanical problems and eventually it
also became unavailable for charters.  The Schwarzes decided it was not worth
the expense to make the Learjet flyable and they ultimately sold it. 
Therefore, starting sometime in 2002, there were no LJ Charter aircraft
available for Air America to charter.

At a specific time not disclosed in the record, the
Schwarzes purchased a new plane, a Westwind.  A large amount of trial time was
spent discussing this Westwind.  According to the testimony, the Westwind was a
nicer aircraft than a Learjet: it had a larger, more luxurious passenger
compartment, and, most important, a larger fuel capacity.  There was testimony
that Air America anticipated the Westwind would be added to its 135 charter
certificate as a replacement for the lost Learjet.  This did not occur. 
Instead, the Schwarzes decided to place ownership of the Westwind into another
company they owned: R & S Aircraft Investments, L.L.C. (“R & S”).  In
addition, the Schwarzes decided to not place the R & S Westwind on Air
America’s 135 charter certificate but instead placed it on that of a
competitor: Starflite Management Group, Inc. (“Starflite”).  There was
testimony this decision was made because Starflite already had Westwinds on its
135 certificate and Air America did not, and to add a Westwind to the Air
America certificate would have required a significant financial investment.[6]  There was also
testimony that the R & S Westwind, while not on Air America’s 135 charter,
was available for Air America to charter at a ten percent commission rather
than the standard fifteen percent commission LJ Charter owed Air America for
the chartering of its aircraft under the Agreement.[7]  Finally, despite
the fact the R & S Westwind was not on Air America’s charter, there was
testimony it was frequently fueled and stored at the Larson Street Hangar and
the bill for such services was never paid.

On July 6, 2003, Trey Schwarz used Air America’s
Learjet to fly his father-in-law to Kansas.  He specifically asked Air America
to bill him for that flight, which it did.  The total invoice for the flight
came to $5,980.00.  Trey Schwarz never paid that invoice.

Ultimately, the biggest issue between Air America and
LJ Charter was the Hangar lease.  The original lease term ran out at the end of
December 2000, and the City extended the lease on a month-to-month basis.  As a
result, there were periodic discussions between Air America, primarily Mike
Edwards, Air America’s vice president, and Trey Schwarz, regarding the status
of the lease negotiations between the City and LJ Charter.  Each time, Trey
Schwarz reported he was taking care of it.  Air America accepted those representations
until August 2003, when it received notice from the City that it had to vacate
the Larson Street Hangar by August 31, 2003.  At that point, Trey Schwarz asked
Air America to stick with LJ Charter as he was working diligently with the City
to work out the lease situation.  Through continuing discussions with Trey
Schwarz, combined with the fact that after August 31, 2003, the City never
moved to force Air America to vacate the Hangar, Edwards believed that LJ
Charter had worked out a new lease with the City.  This belief lasted until Air
America received a Feb. 19, 2004 letter from Trey Schwarz informing Air America
that LJ Charter was terminating its relationship with Air America and that Air
America had to vacate the Larson Street Hangar by March 30, 2004.

This notice to vacate the Hangar was the end result
of Buzzy and Trey Schwarz deciding the economics of the deal with Air America
were not working out.  According to Buzzy Schwarz, the discussions between
father and son probably started some six months before Air America was
ultimately kicked out of the Hangar.  Those discussions also involved the
City.  A September 3, 2003 email from Jim Murff at the City to Trey Schwarz
revealed that McCarter was calling the City to discuss the status of the Hangar
lease and Murff did not want to discuss that situation with McCarter until he
had talked to Trey Schwarz.  These discussions between the City and the Schwarzes
continued and on January 4, 2004, Lucy Ortiz of the City’s aviation department
informed Trey Schwarz that the Larson Street Hangar lessee must actually be the
holder of the 135 certificate.  Trey Schwarz replied that he understood and
that he would work on a different plan.

Trey Schwarz testified this different plan did not
include Air America.  In addition, Trey Schwarz testified that in January 2004
he was already in negotiations with Starflite about Starflite moving into the
Hangar and that he did not inform Air America of those conversations.  On
February 18, 2004, Trey Schwarz told Ortiz that he wanted Starflite to be the
name on the Hangar lease.  In addition, Trey Schwarz told Ortiz: “I would ask
that this remain confidential until I can personally meet with Blair McCarter
as there is more than a business relationship with Air America.”  Trey Schwarz
testified he did not inform Air America of this decision at that time.  On
March 1, 2004 Ortiz emailed the new lease, bearing the name of Starflite as the
lessee, to Trey Schwarz.  Ortiz asked that if he agreed with the lease, to have
Starflite execute three copies and then return the lease to her.  Trey Schwarz
admitted that the City sent the lease to him because he was the person
negotiating with the City for Starflite.  Ortiz also wrote that, “in accordance
with your instructions, [she] changed the name of the Lessee and are now
copying you on any notices required to be given under the lease.”

Ortiz testified during trial by video deposition. 
She testified the City requires the lessee of a 135 hangar to actually hold the
FAA 135 certificate.  According to Ortiz, during a meeting sometime in 2000 involving
the City, LJ Charter, and Air America over the Larson Street Hangar, the City
informed LJ Charter and Air America that they could enter into some kind of
joint venture and form a company and that company would have to hold the 135
certificate.

Ortiz also testified as to how Trey Schwarz had such
influence on the transfer of the Larson Street Hangar from LJ Charter to
Starflite.  She explained that the City works with the current lessee when it is
time to enter into a new lease for a hangar.  According to Ortiz, for the
Hangar to not revert back to the control of the City and then be put out for
lease according to the City’s preferred order of leasing,[8] the same entity
has to remain in control of the lease.  So, according to Ortiz, the City would
have been willing to put the lease in Air America’s name as long as the
Schwarzes, or a company owned by the Schwarzes, owned an interest in Air
America.  However, Trey Schwarz never asked for the lease to be put in Air
America’s name, but instead he asked that Starflite be the named lessee and he
represented to the City that CNS Ventures, L.L.C. (“CNS”), another company
owned by Buzzy Schwarz and Trey Schwarz, owned an interest in Starflite.[9]  Finally, Ortiz
testified that Trey Schwarz conducted all of the negotiations for Starflite to
move into the Larson Street Hangar.

After Air America was evicted from the Larson Street
Hangar, Air America filed suit against several people and entities: LJ Charter,
CNS, Starflite, Buzzy Schwarz, Trey Schwarz, Jeff Ware, and David Trigg.[10]  Air America
asserted numerous causes of action including breach of contract, quantum
meruit, breach of fiduciary duty, fraud, tortious interference with contract,
and conspiracy.  LJ Charter filed a counterclaim asserting causes of action for
breach of contract, fraud, tortious interference with contract, conversion, the
placement of an improper lien on an aircraft, and conspiracy.  In addition, LJ
Charter sought to pierce the corporate veil and hold McCarter personally
liable.

Prior to trial, R & S settled with Air America
for $31,478.00.  Between the verdict and the entry of judgment, Starflite,
Ware, and Trigg (collectively “Starflite”) settled with Air America for $30,000.00
cash and fifty hours of flying time valued at $1,000.00 per hour.

During the formal charge conference Air America made
the following stipulation: “We don’t dispute that these people are agents of
those two companies and I will stipulate that they were.  So I don’t think
those need to go to the jury.”  Counsel for LJ Charter then asked if Air
America “will stipulate that at all times material the answers to those two
questions — what is it, 28 and 29?”  Counsel for Air America agreed it applied
to all four persons mentioned in the proposed questions 28 and 29 and based on
this stipulation, those questions were removed from the charge.[11]  In Air America’s
Cross-Appellant’s Reply Brief, Air America discussed the scope of this
stipulation:

Appellants/Cross-Appellees proposed a jury question
inquiring as to whether Trey Schwarz and Buzzy Schwarz were at all times agents
of LJ and CNS Ventures, LLC.  Air America stipulated to that fact, as
acknowledged by Appellants, and no such question was submitted.  Air America,
however, did not stipulate that the Schwarzes were at all times acting within
the course and scope of their agency or that all of their actions were not for
their own purposes.

The case was submitted to the jury in a lengthy jury
charge containing a total of 32 questions.  The jury determined that:

(1) both LJ Charter and Air America breached the
Agreement;

(2) neither party’s failure to comply was excused;

(3) LJ Charter suffered no breach of contract
damages;

(4) Air America’s breach of contract damages were $25,000
sustained in the past;

(5) Trey Schwarz orally agreed to pay Air America for
charter services;

(6) McCarter did not orally agree to pay LJ Charter
for charter services;

(7) No answer as the question was predicated on a “Yes”
answer to Question 6;

(8) There was an oral agreement for Trey Schwarz to
act as Air America’s agent for lease negotiations with the City;

(9) Trey Schwarz breached his fiduciary duty to act
as Air America’s agent;

(10) Air America’s damages resulting from Trey
Schwarz’s breach of fiduciary duty: $11,780 past value of the agency and
$11,780 lost future profits.

(11) The Agreement formed a joint venture between Air
America and LJ Charter;

(12) LJ Charter is estopped to deny the existence of
a joint venture;

(13) LJ Charter breached the joint venture fiduciary
duty;

(14) Air America’s joint venture fiduciary duty
damages: $25,000 value of the goods and services sustained in the past, $11,780
lost profits sustained in the past, and $11,780 future lost profits;

(15) Starflite, Trigg, Ware, CNS, Buzzy Schwarz, and
Trey Schwarz tortiously interfered with the Agreement;

(16) That interference was not excused or justified;

(16A) No answer because this question was predicated
on a “Yes” answer to Question 16;

(17) Air America’s tortious interference damages were
$11,780 that would be sustained in the future;

(18) Air America and McCarter intentionally
interfered with the contract between Starflite and the City;

(19) That interference was justified;

(20) No answer because the question was predicated on
a “No” answer to Question 19;

(21) LJ Charter, Buzzy Schwarz, and Trey Schwarz
committed common law fraud against Air America;

(22) Air America and McCarter did not commit fraud
against LJ Charter;

(23) Air America’s fraud damages were: (a) the difference
between the value of the Agreement as represented and the actual value of the
Agreement that would be sustained in the future: $11,780; (b) past unjust
enrichment to Starflite: $11,780; and (c) future unjust enrichment to
Starflite: $47,120;

(24) No answer because the question was predicated on
a “Yes” answer to Question 22;

(25) This question had multiple parts: (a) David Trigg,
Ware, and Buzzy Schwarz conspired with Trey Schwarz to breach Trey Schwarz’s
fiduciary duty owed to Air America (Question 10); (b) David Trigg, Ware, Buzzy
Schwarz, and Trey Schwarz conspired with LJ Charter to breach the joint venture
fiduciary duty owed to Air America (Question 14); (c) David Trigg, Ware, Buzzy
Schwarz, and Trey Schwarz conspired to tortiously interfere with the Agreement
(Question 17); and (d) David Trigg, Ware, Buzzy Schwarz, and Trey Schwarz
conspired to commit fraud (Question 23);

(26) No answer because the question was predicated on
a “Yes” answer to Question 22;

(27) McCarter did not place a fraudulent lien;

(28) and (29) were intentionally left blank;

(30) Air America’s attorney’s fees: $80,000;

(31) LJ Charter’s attorney’s fees: $25,000;

(32) No malice as to LJ Charter’s conduct;

(33) No malice as to Air America and McCarter’s conduct.

Following numerous post trial motions, the trial
court entered an Order on Post-Verdict Motions.  In this order, the trial court
granted appellants’ motion to elect remedy.  The trial court then disregarded
the jury’s answer to Question 10 (the damages for Trey Schwarz’s breach of
agency fiduciary duty) because the trial court found those damages were
duplicative of the damages found in response to Question 14 (damages for breach
of joint venture fiduciary duty).  The trial court also disregarded the jury’s
answer to Question 17, tortious interference with contract damages, because the
trial court found they were duplicative of the damages awarded in response to
Question 23, the fraud damages.  The trial court then entered judgment in favor
of Air America and against LJ Charter for $144,240.00 in damages and $80,000.00
in attorney’s fees plus post-judgment interest.[12]

Discussion

On appeal, the parties bring multiple issues
challenging the trial court’s judgment.  We initially address those issues
raised by appellants, we then address Air America’s issues.

I.         Appellants’ Issues on Appeal

A.            
Does the judgment violate the One Satisfaction Rule?

Under the One Satisfaction Rule, a plaintiff is
entitled to only one recovery for any damages suffered.  Crown Life Ins. Co.
v. Casteel, 22 S.W.3d 378, 390 (Tex. 2000).  The rule applies when multiple
defendants commit the same act as well as when defendants commit technically
different acts that result in a single injury.  Id.  If there is only
one injury, even if it is based on several overlapping and varied theories of
liability, a plaintiff will only be permitted one recovery.  Buccaneer Homes
of Alabama, Inc. v. Pelis, 43 S.W.3d 586, 590 (Tex. App.—Houston [1st
Dist.] 2001, no pet.).  In this election of remedy context, whether the rule
applies to reduce a plaintiff’s recovery is determined by the injury, not the
cause of action.  Nowak v. Pellis, 248 S.W.3d 736, 741 (Tex.
App.—Houston [1st Dist.] 2007, no pet.).  The One Satisfaction Rule also
describes the situation where a nonsettling defendant claims a credit toward a
plaintiff’s damages from a payment made by a jointly liable settling
defendant.  Casteel, 22 S.W.3d at 391.

In their first issue, appellants contend the trial
court’s judgment violates both aspects of the One Satisfaction Rule.  First,
they argue the trial court allowed Air America to recover multiple damages for
a single injury.  Second, appellants assert the trial court erred in not giving
LJ Charter a credit for the total amount of the two settlements Air America
negotiated with some of the defendants.  In appellants’ view, since they
contend Air America suffered only a single injury, there was no requirement of
a jury determination that the settling defendants were jointly and severally
liable for the application of the settlement credits.  We address each
contention in turn.

1.      The
Standard of Review

The standard of review for a trial court’s decision
to apply the One Satisfaction Rule is abuse of discretion.  See Oyster Creek
Financial Corp. v. Richwood Investments II, Inc., 176 S.W.3d 307, 326 (Tex.
App.—Houston [1st Dist.] 2004, pet. denied) (applying abuse of discretion
standard of review to the trial court’s application of settlement credits).  A
trial court abuses its discretion by acting arbitrarily, unreasonably, or
without consideration of guiding principles.  Walker v. Gutierrez, 111
S.W.3d 56, 62 (Tex. 2003). 

2.      Did
the judgment award Air America a double recovery for a single injury?

Appellants contend that while Air America asserted
numerous causes of action, the reality was that Air America brought a lawsuit
alleging alternative legal theories seeking to recover for only a single injury. 
Appellants argue the trial court erred when it did not further reduce Air
America’s recovery in response to appellants’ motion to elect a remedy thereby
allowing Air America an impermissible double recovery.

In examining whether Air America suffered only a
single injury and thus received a double recovery, appellants assert we should
consider the following: (1) the alleged existence of only a single contract,
the Agreement; (2) appellants’ contention that Air America pled the same
damages for each cause of action found in Air America’s Seventh Amended
Petition; (3) their contention that the damage questions in the jury charge are
identical; and finally (4) appellants allege that during trial Air America made
no effort to distinguish their damages among the different causes of action. 
In response, Air America asserts the trial court’s judgment properly awarded it
separate and distinct damages under each cause of action.

Initially, we disagree with appellants that since there
may have been only a single contract at issue in Air America’s lawsuit, this
inevitably leads to the conclusion that the judgment includes a double recovery.[13]  Appellants
emphasize Air America’s statement in its brief that all actions brought by Air
America were connected with breaches of the Agreement.  However, the fact that
all of the causes of action are in some manner connected to the Agreement does
not mean that Air America suffered only a single injury: impairment of rights
under that contract.

We turn now to the damages actually awarded in the
judgment.  First, the judgment awarded Air America $25,000 for breach of
contract.  Air America contends this award is supported by the evidence that LJ
Charter did not pay the $25,000 “relocation fee” required by paragraph 7 of
Exhibit “A” to the Agreement and thus constitutes an element of damages separate
and distinct from all other damages awarded in the judgment.  We agree.[14]

The situation becomes less clear when examining the
remaining damages in the judgment.  The judgment includes damages for LJ
Charter’s breach of the joint venture fiduciary duty.  These damages were
broken down as follows: (1) $25,000 for lost past value of fiduciary services;
(2) $11,780 for lost past profits; and (3) $11,780 for lost future profits for
a total of $48,560.  The judgment also includes damages for LJ Charter’s fraudulent
conduct.  These damages were apportioned as: (1) $11,780 as the difference in
value as represented and the actual value of the contract in the future; and
(2) $58,900 for unjust enrichment, for a total of $70,680.

Air America, without distinguishing between causes of
action, asserts these damages are compensation for the following specific
injuries: (1) lost profits as a result of the failure to provide aircraft for
charter both in the past and in the future; (2) increased fuel costs; (3) lost
profits suffered by Air America as a result of the eviction; and (4) unjust
enrichment resulting from the eviction.  Air America further explains that the
unjust enrichment award was based on the profits Starflite received as a
benefit from LJ Charter’s fraudulent conduct once Air America was evicted from
the Hangar and Starflite moved in. 

The evidence at trial established that, as a result
of LJ Charter’s tortious conduct, Air America experienced lost profits in the
past because it was denied the opportunity to charter aircraft while still
occupying the Hangar.  In addition, the evidence established that the City
evicted Air America from the Hangar as a result of the machinations of LJ
Charter and Air America incurred increased fuel costs as a result.  In
addition, the evidence established that, as a result of the eviction, Air
America experienced lost past and future profits.  Finally, the evidence
established that as a result of LJ Charter’s tortious conduct, Starflite was
able to take over the lease of the Hangar and was unjustly enriched because it
was thereby able to earn greater profits than it would have but for LJ
Charter’s wrongful conduct.  See Sandare Chemical Co., Inc. v. Wako Int’l,
Inc., 820 S.W.2d 21, 24 (Tex. App.—Fort Worth 1991, no writ) (noting that
evidence of a defendant’s profits may constitute evidence of a plaintiff’s lost
profits).  Based on the above, we conclude the breach of joint venture fiduciary
duty and fraud damages included in the judgment compensate Air America for the
same injuries.  Therefore, Air America’s causes of action for breach of joint
venture fiduciary duty and fraud constitute alternative theories of liability
based on proof of the same facts and the judgment’s award of damages for both is
an impermissible double recovery in violation of the One Satisfaction Rule.  See
Lundy v. Masson, 260 S.W.3d 482, 506 (Tex. App.—Houston [14th Dist.] 2008,
pet. denied) (concluding the plaintiff received a double recovery as he established
separate theories of liability, breach of fiduciary duty and fraud, based on
the same facts).  When a plaintiff establishes separate theories of liability based
on the same facts and fails to elect between them, the appellate court should
render judgment on the finding affording the greatest recovery.  Id. 
Accordingly, because Air America did not elect its remedy, we hold that the
trial court should have made the election for Air America and limited Air
America’s recovery to the damages awarded for its fraud claim because that
awarded the greatest recovery.  We sustain that portion of appellants’ first
issue arguing the judgment amount should be reduced because it resulted in a
double recovery for Air America. 

3.         Should the trial court have reduced the
judgment amount through the application of settlement credits?

In the Order on Post-Verdict Motions, the trial court
determined LJ Charter was not entitled to any settlement credit.  First, the
trial court concluded LJ Charter was not entitled to a credit for the R & S
pre-trial settlement because the agreement was limited to claims separate and
distinct from those presented to the jury and there was no showing R & S
was jointly and severally liable for any common damages.  Next, the trial court
determined the Starflite post-verdict settlement agreement included a claim for
damages for which the settling and non-settling defendants were found jointly
and severally liable (Jury Question 15, intentional interference with written
contract).  However, it went on to conclude LJ Charter was not entitled to a
credit because of the trial court’s ruling on Defendant’s Motion to Elect
Remedy.  In that ruling, the trial court prohibited Air America from recovering
on its intentional interference with contract claim (Questions 15 and 17)
because the damages were duplicative of the fraud damages found in response to
Question 23.  On appeal, LJ Charter contends the trial court should have given
it a credit for the total amount of both settlements because Air America
suffered only a single injury and thus there was no requirement that the
settling parties be found jointly and severally liable.  We disagree.

a.      The
R & S Pre-Trial Settlement.

Air America’s settlement with R & S was made
prior to the trial.  As revealed by the language of the settlement agreement,
the settlement was for fuel and storage for the R & S jet and resolved Air
America’s quantum meruit claim brought exclusively against R & S.  The
allocation in the settlement agreement is determinative.  See Mobil Oil
Corp. v. Ellender, 968 S.W.2d 917, 928 (Tex. 1998) (holding that a
non-settling party is entitled to a settlement credit for the entire amount of
a settlement unless a settlement agreement allocating damages is tendered to
the trial court).  Because no other defendant could have been liable for these
damages, and the settlement agreement specifically allocated the settlement to
the fuel and storage damages, we hold the trial court did not abuse its
discretion when it determined appellants were not entitled to a credit for the
amount of the R & S settlement payment.  Id.; CTTI Priesmeyer,
Inc. v. K & O Ltd. Partnership, 164 S.W.3d 675, 685 (Tex. App.—Austin
2005, no pet.).

b.      The
Starflite Post-Verdict Settlement.

The Texas Supreme Court’s decision in Casteel
controls the determination of whether appellants are entitled to a settlement
credit as a result of the Starflite settlement.  CTTI Priesmeyer, 164
S.W.3d at 685.  Under Casteel, a non-settling defendant is only entitled
to a settlement credit based on the damages for which all defendants are jointly
liable.  Casteel, 22 S.W.3d at 391.  Here, because Starflite, Ware, and David
Trigg were not parties to the Agreement, they could not be jointly liable for
the breach of contract damages.  CTTI Priesmeyer, 164 S.W.3d at 685.  The
result is the same for the fraud damages.  While the jury found Ware and David Trigg
were conspirators to the fraud, Starflite was not.  Therefore, under Casteel,
since Starflite could not be jointly and severally liable with appellants for
these damages, appellants are not entitled to a credit for the amount of the
Starflite settlement.  Casteel, 22 S.W.3d at 391.  We overrule that part
of appellants’ first issue asserting the trial court abused its discretion when
it refused to apply settlement credits to the judgment amount.

B.             
Is the evidence supporting the judgment legally and factually
sufficient?

We turn now to appellants’ issues challenging the
sufficiency of the evidence supporting the judgment.[15]

1.         The Standard of Review.

When both legal and factual sufficiency challenges
are raised on appeal, we must first examine the legal sufficiency of the
evidence.  City of Houston v. Cotton, 171 S.W.3d 541, 546 (Tex.
App.—Houston [14th Dist.] 2005, pet. denied).  In a legal sufficiency review,
we must view the evidence in the light most favorable to the verdict and
indulge every reasonable inference that supports the verdict.  City of
Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005).  We must credit evidence
that supports the judgment if reasonable jurors could and disregard contrary
evidence unless reasonable jurors could not.  See id. at 807, 827.  If
the evidence falls within the zone of reasonable disagreement, we cannot
substitute our judgment for that of the fact finder.  Id. at 822.  The
trier of fact is the sole judge of the witnesses’ credibility and the weight to
be given their testimony.  Id. at 819.  Unless there is no favorable
evidence, or if the contrary evidence renders supporting evidence incompetent,
or conclusively establishes the opposite, we must affirm.  See id. at
810–11.  “The final test for legal sufficiency must always be whether the
evidence at trial would enable reasonable and fair minded people to reach the
verdict under review.”  Id. at 827.  This court may sustain a legal
sufficiency, or no evidence, point only if the record reveals one of the
following: (1) the complete absence of a vital fact; (2) the court is barred by
rules of law or of evidence from giving weight to the only evidence offered to
prove a vital fact; (3) the evidence offered to prove a vital fact is no more
than a scintilla; or (4) the evidence established conclusively the opposite of
the vital fact.  Id. at 810.  When the evidence offered to prove a vital
fact is so weak as to do no more than create a mere surmise or suspicion of its
existence, the evidence is less than a scintilla and, in legal effect, is no
evidence.  See Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex.
2004).

In reviewing the factual sufficiency of the evidence,
we must examine the entire record, considering both the evidence in favor of,
and contrary to, the challenged findings.  See Maritime Overseas Corp. v.
Ellis, 971 S.W.2d 402, 406–07 (Tex. 1998); Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986).  When a party challenges the factual sufficiency of the
evidence supporting a finding for which it did not have the burden of proof, we
may set aside the verdict only if it so contrary to the overwhelming weight of
the evidence as to be clearly wrong and unjust.  See Ellis, 971 S.W.2d at
407; Nip v. Checkpoint Systems, Inc., 154 S.W.3d 767, 769 (Tex.
App.—Houston [14th Dist.] 2004, no pet.).  When a party attacks the factual
sufficiency of an adverse finding on which it had the burden of proof, it must
demonstrate on appeal that the adverse finding is against the great weight and
preponderance of the evidence.  Dow Chem. Co. v. Francis, 46 S.W.3d 237,
242 (Tex. 2001).  The amount of evidence necessary to affirm is far less than
the amount necessary to reverse a judgment.  GTE Mobilnet of S. Tex. v.
Pascouet, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet.
denied).  We are not a factfinder.  Ellis, 971 S.W.2d at 407. 
Accordingly, we may not pass upon the witnesses’ credibility or substitute our
judgment for that of the jury, even if the evidence would support a different
result.  Id.  If we determine the evidence is factually insufficient, we
must detail the evidence relevant to the issue and state in what regard the
contrary evidence greatly outweighs the evidence in support of the verdict; we
need not do so when affirming a jury’s verdict.  Gonzalez v. McAllen Med.
Ctr., Inc., 195 S.W.3d 680, 681 (Tex. 2006) (per curiam).

2.         Does the merger clause in the Agreement
preclude Air America’s claim for common law fraud?

In their fourth issue, appellants argue there is
legally and factually insufficient evidence of the reliance element of fraud
because the Agreement contains a merger clause.

To recover for common law fraud, a plaintiff must
prove: (1) a material representation was made by the defendant; (2) the
representation was false; (3) when the defendant made the representation, he
knew it was false or made it recklessly without knowledge of the truth and as a
positive assertion; (4) the defendant made the representation with the
intention that it should be acted upon by the party; (5) the party acted in
reliance upon it; and (6) the party thereby suffered injury.  Lund, 260
S.W.3d at 492.

A merger clause is a “provision in a contract to the
effect that the written terms may not be varied by prior or oral agreements
because all such agreements have been merged into the written document.”  Ikon
Office Solutions, Inc. v. Eifert, 125 S.W.3d 113, 125 n.6 (Tex.
App.—Houston [14th Dist.] 2003, pet. denied) (quoting Black’s Law Dictionary 989 (6th ed. 1990)).  A merger clause
“that clearly expresses the parties’ intent to waive fraudulent inducement
claims, or one that disclaims reliance on representations about specific
matters in dispute, can preclude a claim of fraudulent inducement.”  Schlumberger
Technology Corp. v. Swanson, 959 S.W.2d 171, 181 (Tex. 1997). 

The merger clause in the Agreement provides:

This Agreement constitutes the entire agreement of the
parties hereto and supercedes any prior understandings or written or oral agreements
between the parties respecting the subject matter hereof, and may only be
modified in writing executed by all of the parties hereto. 

Citing this court’s Eifert
opinion, appellants contend the above merger clause defeats the reliance
element of fraud as a matter of law and therefore the trial court erred when it
entered judgment awarding damages for fraud.  We disagree.

            In Eifert,
after extensive negotiations, the owner of a successful copier business sold
the business to Ikon in exchange for Ikon stock and an employment agreement
with Ikon.  Id. at 118–19.  Much of the negotiations focused
specifically on the terms of the owner’s employment agreement.  Id. at
126.  Then, reflecting that history of extensive negotiations, the employment
agreement had a merger clause that, in addition to standard merger clause language,
contained the following: “[N]o commitments have been made relative to bonuses,
guarantees or any other special provisions, except as specifically identified
herein.”  Id. at 120.  Eventually, the owner became disenchanted with
the way Ikon was running the merged businesses and filed suit alleging Ikon
committed fraud with respect to his employment agreement.  Id. at 122.  The
jury found in favor of the owner and the trial court entered judgment
accordingly.  Id. at 123.  On appeal, this court determined the merger
clauses in the acquisition and employment agreements disclaimed reliance on any
representations about specific matters in dispute and therefore precluded any
fraud claims based on representations outside of those two agreements.  Id.
at 128.

While appellants argue the merger clauses in Eifert
and the Agreement are substantially similar, we disagree.  The merger clause in
the Agreement does not clearly expressly the parties’ intent to waive any fraud
claims.  In addition, unlike the merger clause in Eifert, the merger
clause in the Agreement does not contain a specific clause disclaiming reliance on representations
concerning matters in dispute in this litigation.  Therefore, we conclude the
merger clause in Eifert is distinguishable and hold the Agreement’s
merger clause does not preclude Air America’s common law fraud claim.  We
overrule appellants’ fourth issue.

3.         Did the judgment improperly award
unjust enrichment damages to Air America?

In their fifth issue appellants, while claiming to challenge
the sufficiency of the evidence, actually contend the trial court erred when,
based on the jury’s answer to Question 23, it awarded Air America damages for unjust
enrichment, a cause of action which appellants claim Air America did not plead. 
In response, Air America argues that (1) unjust enrichment is an appropriate
measure of damages for fraudulent conduct; and (2) its pleadings were adequate
to support the submission of Question 23 to the jury.  We agree with Air
America.

A party may recover under the unjust enrichment theory
when a person has obtained a benefit from another by fraud, duress, or the
taking of an undue advantage.  Heldenfels Brothers, Inc. v. City of Corpus
Christi, 832 S.W.2d 39, 41 (Tex. 1992).  In its seventh amended petition,
Air America asserted two common law fraud causes of action against LJ Charter,
one for misrepresentations prior to moving into the Hangar and one for
misrepresentations after moving into the Hangar.  As part of both causes of
action, Air America alleged: “this fraudulent conduct has resulted in a benefit
to Defendant Starflite in increased recapture of fuel costs it has experienced
and will experience while in the Hangar ($1,381,341), or in the alternative,
the amount of profits it has made and will make while in the Hangar
($819,229.17).”  Because appellants did not file special exceptions to Air
America’s petition, we must construe the petition liberally in Air America’s
favor.  Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 897 (Tex.
2000).  Liberally construing Air America’s petition as we must, we conclude Air
America pleaded information specific enough to provide appellants with notice
of the damages it was seeking pursuant to its common law fraud cause of
action.  Id.  We overrule appellants’ fifth issue.

4.         Did appellants waive their sixth issue
on appeal?

In their sixth issue, appellants assert there is
legally and factually insufficient evidence that LJ Charter breached the
agreement and that Air America suffered $25,000 damages as a result of that
breach.  On appeal, an appellant’s brief must contain a clear and concise
argument for the contentions made with appropriate citations to authorities and
the record.  Tex. R. App. P. 38.1(h).  Failure to do so results in waiver of
the issue on appeal.  Here, while appellants included this issue in their
points of error, they failed to address this issue within the body of their
brief.  Accordingly, appellants have waived this issue on appeal and therefore,
we overrule their sixth issue.

5.         Was LJ Charter entitled to recover attorney’s
fees?

In their eighth issue, appellants point out that, in
response to Question 31, the jury found that LJ Charter’s reasonable attorney’s
fee was $25,000.00.  Appellants then argue that because Air America recovered fewer
damages than it had originally sought, the trial court should have included the
$25,000.00 attorney’s fees in the judgment.  However, to recover attorney’s
fees under section 38.01 of the Civil Practice & Remedies Code, the Texas
Supreme Court has determined that the party must first recover contract
damages.  Green Intern., Inc. v. Solis, 951 S.W.2d 384, 390 (Tex. 1997). 
Since the jury determined that LJ Charter suffered no damages as a result of
Air America’s breach of the Agreement, the trial court properly denied LJ
Charter any recovery of attorney’s fees.  Id.  Accordingly, we overrule
appellants’ eighth issue. 

6.         Was the evidence factually sufficient
on those issues where appellants bore the burden of proof?

Under their ninth issue, appellants bring a multitude
of separate challenges to the sufficiency of the evidence supporting the jury’s
answers to questions on which appellants had the burden of proof.  These
include: (a) the jury’s finding in answer to Question 3 that LJ Charter
suffered no damages as a result of Air America’s breach of the Agreement; (b)
the jury’s finding in answer to Questions 6 and 7 that McCarter did not orally
agree to pay LJ Charter for charter services; (c) the jury’s finding in answer
to Questions 22 and 24 that Air America and McCarter did not commit fraud; (d)
the jury’s finding in answer to Question 26 that McCarter was not responsible
for the conduct of Air America; and (e) the jury’s finding in answer to
Question 27 that McCarter did not place a fraudulent lien against LJ Charter’s
aircraft.  In bringing these issues, appellants failed to cite to any legal
authorities.  As mentioned above, an appellant’s brief must contain a clear and
concise argument for the contentions made with appropriate citations to
authorities and the record.  Tex. R. App. P. 38.1(h).  Failure to do so results
in waiver of the issue on appeal.  Accordingly, we conclude appellants have
waived appellate review of each of the above points.  We overrule appellants’
ninth issue.

II.        Air America’s Cross-Appeal

A.        Are Trey Schwarz and Buzzy Schwarz directly
liable for fraud damages imposed against LJ Charter?

In its second cross-point,[16] Air America
contends the trial court should have held Trey Schwarz and Buzzy Schwarz
jointly and severally liable for the fraud damages imposed against LJ Charter. 
Air America makes two arguments in support of its argument Trey and Buzzy
Schwarz should be held jointly and severally liable.  First, Air America asserts
Buzzy and Trey Schwarz are directly liable for the fraud.  Second, Air America
argues that since, in answer to Question 23, the jury found that both Trey and
Buzzy Schwarz were part of a civil conspiracy to commit fraud, they must be
held jointly and severally liable for the fraud damages.  We need only address
Air America’s direct liability argument.

It is the general rule
in Texas that company agents are individually liable for fraudulent or tortious
acts committed while in the service of their limited liability company.  Sanchez
v. Mulvaney, 274 S.W.3d 708, 712 (Tex. App.—San Antonio 2008, no pet.).
 The jury, in response to Question 21, found that both Trey Schwarz and Buzzy
Schwarz committed fraud against Air America.  Therefore, since Trey Schwarz and
Buzzy Schwarz committed fraud, the judgment should have held them, along with
LJ Charter, jointly and severally liable for the fraud damages.  Accordingly,
we sustain Air America’s second cross-point on appeal.

B.        Should the final judgment be modified to
award Air America damages for Trey Schwarz’s failure to pay for air charter
services?

Air America claimed that Trey Schwarz orally agreed
to pay Air America for air charter services when he used Air America’s plane to
fly his ill father-in-law.  In connection with that claim, Question 5 was
submitted to the jury: “Did Trey Schwarz orally agree to pay Air America for
charter services?”  The jury answered “yes” to that question.  On appeal, Air
America contends the evidence of the value of those air charter services and
Trey Schwarz’s failure to pay for them, was uncontroverted at trial and therefore
no further questions had to be submitted to the jury in order for the final
judgment to impose $5,980.00 damages against Trey Schwarz.  We agree.

Having reviewed the record, we can find no evidence
disputing: (1) the value of the air charter services provided by Air America;
or (2) Patricia Toman’s testimony that Air America invoiced Trey Schwarz
$5,980.00 for those services and that he never paid that invoice.  When facts
are undisputed or conclusively established, there is no need to submit those issues
to the jury.  XCO Production Co. v. Jamison, 194 S.W.3d 622, 633 (Tex.
App.—Houston [14th Dist.] 2006, pet. denied) (citing Sullivan v. Barnett,
471 S.W.2d 39, 44 (Tex. 1971)).  We conclude that, as a result of the jury’s
answer to Question 5 and the undisputed evidence as to the value of the
services and Trey Schwarz’s failure to pay, the trial court erred when it did
not include the $5,980.00 damages in the judgment.  See Tex. R. Civ. P.
301 (“The judgment of the court shall conform to the pleadings, the nature of
the case proved and the verdict, if any, and shall be so framed as to give the
party all the relief to which he may be entitled either in law or in
equity.”).  We sustain Air America’s third cross-point on appeal.

Conclusion

            We affirm the trial
court’s judgment in favor of Air America on Air America’s breach of contract
cause of action based on the Agreement.  Having sustained part of appellants’
first issue on appeal and Air America’s second and third cross-points on
appeal, we modify the judgment as follows:  (1) Air America’s recovery for
breach of joint venture fiduciary duty is deleted as a violation of the One
Satisfaction Rule; (2) Air America shall recover $5,980.00 from Charles N.
“Trey” Schwarz, III for breach of the oral agreement to pay for air charter
services; and (3) LJ Charter, L.L.C., Charles N. “Buzzy” Schwarz, Jr., and
Charles N. “Trey” Schwarz, III, shall be jointly and severally liable for Air
America’s common law fraud damages.  Having modified the judgment, we affirm
the judgment as modified.   

                                                                                   

                                                                        /s/        John
S. Anderson

                                                                                    Justice

 

 

 

Panel consists of Chief
Justice Hedges and Justices Anderson and Boyce.

 









[1] Appellants and
cross-appellees are LJ Charter, L.L.C., Charles N. “Buzzy” Schwarz, Jr.,
Charles N. “Trey” Schwarz, III, and CNS Ventures, L.L.C.  Where necessary, we
refer to them collectively as appellants.





[2] There was testimony
during the trial that hangars located at Hobby Airport are in short supply and
there is a long waiting list of parties interested in leasing a hangar when one
becomes available.





[3] It is not clear from the
record how this arrangement was sufficient to avoid the City terminating the
lease.  City representatives testified during trial such an arrangement never
met the requirement as the City had always required that the lessee be the
actual holder of the FAA 135 certificate.





[4] The Larson Street Hangar
could hold up to six aircraft the size of a Learjet.





[5] Paragraph 6 addressed
what would occur if Air America chose not to exercise its right of first
refusal and a third party purchased LJ Charter’s leasehold interest in the
Hangar. 





[6] While Air America did not
dispute the fact it did not have a Westwind on its charter certificate, there
was testimony by McCarter that he was willing to pay the price to add the
Westwind to Air America’s 135 charter and was never given the option to do so.





[7] It was revealed during
trial that it is common practice for a charter company, when the aircraft under
its direct control are unavailable, to use a third-party charter company’s
aircraft.  Under that scenario, the third party’s charters take priority and it
will only make an aircraft available if it does not need it.  As might be
expected, there was disputed testimony as to (1) how often Air America asked to
charter the R & S Westwind, and (2) how often the R & S Westwind was
available when Air America did ask to charter it. 





[8] According to Ortiz, Full
Base Operators have first priority for leasing a newly available hangar.  The
record does not disclose exactly what constitutes a Full Base Operator. 
However, the record is clear that neither Air America nor LJ Charter were Full
Base Operators. 





[9] The trial testimony and
exhibits revealed that CNS Ventures, L.L.C. never acquired an ownership
interest in Starflite.  In addition, Ortiz testified she was not aware of what
minimum ownership interest was sufficient to meet the City’s requirements.





[10] Jeff Ware and Jerri
Trigg each own a fifty percent interest in Starflite.  David Trigg, Jerri
Trigg’s husband, owned no interest in Starflite, but was heavily involved in
the day-to-day operations of Starflite as a consultant.





[11] The proposed questions
28 and 29 are not found in the appellate record.





[12] The damages were broken
down as follows: (1) breach of contract: $25,000.00; (2) breach of joint
venture fiduciary duty: (a) lost past value of fiduciary services: $25,000.00,
(b) lost past profits: $11,780.00, and (c) lost future profits: $11,780.00; and
(3) common law fraud: (a) difference in actual value as represented and actual
value of contract in future: $11,780.00, (b) past unjust enrichment:
$11,780.00, and (c) future unjust enrichment: $47,120.00. 





[13] We also disagree there
was only a single contract at issue in the litigation.  In addition to the
Agreement, Air America alleged there was an oral contract between Air America
and Trey Schwarz for the provision of air charter services.  By affirmatively
answering Question 5, the jury agreed with Air America.  We address this oral
contract in section II(B) below.





[14] The award of damages for
breach of contract supports the judgment’s award of Air America’s attorney’s
fees, which have not been challenged on appeal.





[15] In issue 2, appellants
challenge the legal and factual sufficiency of the evidence supporting the
jury’s answers to questions 11, 13, and 14.  These questions all relate to Air
America’s breach of joint venture fiduciary duty cause of action.  In their
third issue, appellants challenge the legal and factual sufficiency of the
evidence supporting the jury’s answers to questions 8, 9, and 10.  These
questions relate to Air America’s cause of action against Trey Schwarz for
breach of his fiduciary duty as an agent of Air America.  In their seventh
issue, appellants challenge the legal and factual sufficiency of the evidence
supporting questions 15 and 17, which relate to Air America’s tortious
interference cause of action.  Each of these issues challenge the sufficiency
of the evidence supporting causes of action which were not included in the
trial court’s judgment or have been excluded from the modified judgment on
appeal.  Since we affirm the judgment holding LJ Charter liable for breach of
the Agreement and fraud, we need not address the above issues because they are
not included in the modified final judgment.  See BBQ Blues Texas, Ltd. v.
Affiliated Business Brokers, Inc., 183 S.W.3d 543, 546 (Tex. App.—Dallas
2006, no pet.).  





[16] Because we have already
determined that Air America’s breach of joint venture fiduciary duty and fraud
causes of action both sought compensation for a single injury, we need not
address Air America’s first cross-point on appeal asserting Trey and Buzzy Schwarz
should have been held jointly and severally liable for the breach of joint
venture fiduciary duty damages.