**Affirm and Opinion Filed September 29, 2021**



In The
### Court of Appeals
### Fifth District of Texas at Dallas

No. 05-19-01228-CV

**TEXAS SOCCER FOUNDATION, Appellant**
**V.**
**STING SOCCER FOUNDATION, Appellee**

**On Appeal from the 193rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-07441**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Pedersen, III, and Goldstein
Opinion by Justice Pedersen, III

Texas Soccer Foundation (TSF) appeals the trial court's judgment granting

specific performance of the parties' agreement for the sale of TSF's real property to

appellee Sting Soccer Foundation (Sting). In two issues, TSF challenges the trial

court's denial of its Motion for Judgment Not Withstanding the Verdict and the

court's award of attorney's fees to Sting. We affirm.

### Background

TSF and Sting are both non-profit corporations, formed to support girls and

young women playing soccer. At all times relevant to this appeal, TSF's three

officer-directors were James Watson, Rex Stewart, and William Kinder; Brent Corrali was the principal owner and CEO of Sting.

The property at issue in this case is a six-acre tract in Richardson, Texas that is owned by TSF (the Buckingham Property). It includes the fields on which Sting teams have played since the mid-1990s as well as the offices for the Sting foundation. When Corrali purchased the name and operations of Sting in 2007, his new entity could not afford to buy the Buckingham Property, but it has leased the tract from TSF since that time. Sting's rent payments serviced the debt owed by TSF for its mortgage on the property. And after 2007, the parties continued to engage in occasional, informal talks concerning the sale of the Buckingham Property to Sting.

In the summer of 2015, the parties' communications concerning sale of the Buckingham Property took a more serious turn.[1] In June of that year, Watson—who was designated by TSF as the point person through the years of talks with Corrali—heard a rumor that Sting planned to move from the Buckingham Property. Watson texted Corrali concerning the rumor, and Corrali responded:

> What you're hearing is [our] offices are moving. The fields are in my picture but I need to get an agreement between us quick. I would never leave you or make a deal without you knowing and being involved. You have my word on that. I want that facility to be the main Home of Sting Soccer always. Let's get this put to bed.

Watson responded:

---

[1] The parties communicated primarily by text and email. We quote their messages as necessary to describe the parties' relationships and representations.

> Sounds good, Rex and I are in agreement and will have a proposal within the next few weeks, I am out next week.

On September 3, Watson texted Corrali that he and Stewart had a proposal and would like to meet to discuss "the broad points." It appears that the three men met on September 18, and the following week, Corrali texted Watson, asking for a survey that his own surveyor could "work from" as well as a legal description of the property.

Negotiations were apparently interrupted for a time because of travel and medical issues, but on November 19, Watson texted:

> Rex and I have agreed to outvote Bill, plan to meet with him the week after tgiving [sic]. We don't have the paperwork, asked Bill for it and he said he didn't have it either .... We will know how big a fight we have soon.

On December 7, Corrali followed up, asking whether the meeting had taken place. Watson responded:

> We had one of our regular meetings, Rex and I ganging up on Bill. Rex actually got pissed. Bill wants to meet with you ..... We are trying to establish a current value for Bill. All is good but give us a little time. [W]e want him to be on board.

Corrali testified that Watson called the board "dysfunctional" and that Watson told him it was a regular occurrence for the board to be fighting within itself. But Watson testified that he and Stewart had agreed that if they could make a deal with Sting, they would outvote Kinder. Watson testified further that—to determine a current value of the Buckingham Property—he was authorized by TSF to obtain an appraisal

of the property. That appraisal is dated February 4, 2016, and it assesses the value of the Buckingham Property at $1,420,000.00.

On March 22, Watson texted Corrali:

Brent, just called Rex and agreed to move ahead without Bill. Let's talk about what our agreement needs to say. Basic framework is still that you will continue to pay off our note and when done TSF will extend a 650k note for sale of property. Deed work done at that time. Rex is traveling with work the next two weeks but we can email docs to him.

Corrali agreed as to this "basic framework" and agreed to have his attorney draw up the necessary documents. At this point, Watson testified he turned things over to Stewart to deal with Sting's attorney. By the end of May, initial documents were drafted, and Watson and Stewart were reviewing them. Texts indicated that Watson and Stewart met on June 28.

On July19, Stewart emailed Watson—and Watson forwarded to Corrali—a term sheet (the Term Sheet) Stewart had put together. The Term Sheet included eleven terms introduced by the statement: "The Foundation is willing to sell if the sale can be accomplished under under [sic] the following terms[.]" Stewart's email stated that this was a "first draft" and it "needs work." However, the record does not include a revision of this list, which identified the property, included a purchase price of $1.3 million, and addressed terms of payment as well as Sting's responsibility for utilities, real estate taxes, and insurance on the property during the term of the note. The Term Sheet also assigned to Sting the task—and thus, the cost—of drawing up formal documents for the sale. Watson testified the list was Stewart's effort to give

Sting's attorney the information he needed to draft those documents. The Term Sheet reflected the issues that Watson and Stewart had discussed together and that Watson, as TSF liaison, had discussed with Corrali.

Watson testified that he was sure the formal documents drafted by Sting's attorney incorporated the requirements of the Term Sheet. And Sting's attorney, Bert Starr, testified that he worked from the Term Sheet. By September 19, Starr had circulated a draft sales agreement that was acceptable to Stewart and Watson if "some small clerical changes" were made. Watson emailed a list of those clerical changes to Corrali, and said "[t]his should satisfy our side." The list included a provision about notice of default to the bank holding the mortgage on the Buckingham Property; Watson had sent the documents to the bank so its attorneys could review them, and the notice provision was the Bank's only comment.

On October 3, Starr sent a revised set of documents to Corrali, Watson, and Stewart. Stewart asked Starr to name a different title company, and on October 24, Starr sent a revised sale agreement, which made that change (the October 24 Agreement). Starr testified that, after the October 24 Agreement was sent, no one from TSF asked for additional revisions to the documents. Days later, Corrali phoned Stewart and—with Starr on the line—asked Stewart if they had a deal. Starr testified that Stewart responded: "Yes, we have a deal." Finally, on November 15, Watson texted Corrali, saying he and Stewart were meeting to "finalize" matters and would be finished in a matter of days. Corrali believed this meant that Watson and Stewart

were presenting Kinder with what Watson called the "final package" of paperwork, signing the deal, selling the property, "and we were moving on."

The October 24 Agreement, however, was not signed. The three TSF directors met, and Kinder opined that the sales price was too low. He produced two offers for the land that were over $2 million, and he threatened to remove Watson and Stewart from the board if they voted to approve the October 24 Agreement with Sting. Kinder also had an attorney write a letter to Watson and Stewart "raising the issue of potential liability on [their] parts if [they] did not act prudently with fiscal responsibility towards the not-for-profit Foundation in the face of these other [offers]." Kinder eventually obtained an agreement to sell the property to a condominium developer; Stewart voted with Kinder to approve that agreement.

Sting sued TSF for breach of contract, demanding specific performance of the parties' October 24 Agreement. The case was tried to a jury.[2] The trial court's charge submitted three questions:

> (1) Did Texas Soccer Foundation authorize the agreement concerning the Buckingham property?
>
> (2) Did the parties agree to conduct the transaction concerning the Buckingham property by electronic form?
>
> (3) Is Sting Soccer Foundation entitled to specific performance of the agreement for the sale of the Buckingham property?

---

[2] The parties submitted their proposed jury charges. Both proposals were rejected by the trial court, but they are included in our record as court exhibits.

The jury answered all three questions "yes," and the trial court signed its judgment awarding the Buckingham Property to Sting.

This appeal followed.

**Discussion**

In its first issue, TSF contends that the trial court erred by denying its Motion for Judgment Notwithstanding the Verdict (the JNOV Motion) and entering judgment for Sting for four reasons. "The standard for reviewing a judgment notwithstanding the verdict, like all other motions rendering judgment as a matter of law, requires a reviewing court to credit evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Cent. Ready Mix Concrete Co., Inc. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007). We address TSF's four arguments in turn.

*Authority to Sell the Buckingham Property*

At the outset, TSF challenges the sufficiency of the evidence supporting the jury's affirmative response to the charge's first question, i.e., whether TSF authorized the agreement concerning the Buckingham Property. "An agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority)." *Southampton Ltd. v. Four Horsemen Auto Group, Inc.*, No. 05-14-01415-CV, 2016 WL 3964731, at *4 (Tex. App.—Dallas July 20, 2016, no pet.) (mem. op.) (citing *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007)).

TSF contends that Watson and Stewart possessed neither actual nor apparent authority to make an agreement to sell the Buckingham Property. Sting argues that the two directors were clothed with both actual and apparent authority to make that agreement.

We conclude that—at a minimum—TSF permitted Watson and Stewart to act with apparent authority in this case. Apparent authority is based on estoppel; it may arise either (a) from a principal knowingly permitting an agent to hold himself out as having authority, or (b) by a principal's actions that lack such ordinary care as to clothe the agent with the indicia of authority. *Gaines*, 235 S.W.3d at 182. The principal must have knowledge of all material facts to establish a claim of apparent authority based on estoppel, and we look to the conduct of the principal in making our determination. *Id.* We ask whether "a reasonably prudent person, using diligence and discretion to ascertain the agent's authority" would believe the agent was authorized to act for the corporation. *Id.* at 183. Accordingly, we determine an agent's apparent authority by examining the conduct of the principal and the reasonableness of the third party's assumptions about the agent's authority." *Id.*

*The Conduct of TSF*

The principal here is TSF. It is a non-profit corporation, but it never adopted any bylaws to govern its operations. Where it is necessary or helpful, we look to TSF's Articles of Incorporation (the Articles) or to the Texas Business Organizations

–8–

Code to address its corporate conduct. The Articles called for a board composed of three directors. At all relevant times, TSF's directors were Kinder, Watson, and Stewart. This board was charged with managing TSF's corporate affairs. TEX. BUS. ORGS. CODE ANN. § 22.201. The code provides, and the jury was instructed, that "[t]he act of a majority of the directors present in person or by proxy at a meeting at which a quorum is present at the time of the act is the act of the board of directors of a corporation, unless the act of a greater number is required by the certificate of formation or bylaws of the corporation." *Id.* § 22.214. By statute, TSF's quorum for transacting business was formed by any two of its three directors. *See id.* § 22.213(a)(1). The Articles did not require more than two directors—in this case, both a quorum and the majority of the board—to act for the foundation.

TSF places great emphasis upon the code's reference to the directors' acting "at a meeting," and contends that the agreement in this case was never approved at a meeting of the board. We disagree with this narrow interpretation of section 22.214. Neither the Articles nor the business organizations code defines or otherwise provides requirements for a meeting. Nor did these directors adopt any governing rules in bylaws that called for meeting times, meetings places, notice of meetings, or any other required formality.[3] On the contrary, Watson testified—and Stewart

---

[3] TSF did not raise challenges to notice under section 22.217 or to the applicability of sections 22.252 and 22.164 in its opening brief. Instead, those statutory issues concerning lack of notice and sale of its land as a "fundamental action" were not brought forward until TSF's reply brief. Issues raised for the first time in a reply brief may not be considered. *See Humphries v. Advanced Print Media*, 339 S.W.3d 206, 208

agreed—that the foundation's board was "a loosely-formed association," and that "[w]hen we needed to have a meeting we just called each other and had a meeting." The parties' communications indicate that Watson and Stewart met a number of times during the negotiations.[4] Viewing the evidence in the light most favorable to the verdict, as we must, we conclude that the jury could have reasonably concluded that when Watson and Stewart conferred and acted together, their action was the action of TSF's board of directors.

Undisputed testimony at trial established that TSF had been trying to sell the property to Sting for more than ten years. Throughout that period of time, Watson was the main contact person with Sting. In 2015 and 2016, Stewart joined Watson in active efforts to negotiate the sale with Corrali. Again, viewing the evidence in light most favorable to the verdict, the jury could have reasonably concluded that when two of TSF's three directors worked together toward that end, TSF was permitting them to hold themselves out as having authority to act for TSF concerning sale of the Buckingham Property.

Similarly, the requirement that the principal have knowledge of the agents' conduct is satisfied here by Stewart's and Watson's own knowledge of all

(Tex. App.—Dallas 2011, no pet.) ("In general, an issue raised for the first time in a reply brief may not be considered."). Therefore we may not consider those issues in our analysis.

    [4] Indeed, given the parties' agreement to conduct this particular transaction electronically (discussed *infra*), we see no constraints from the code, the Articles, or the directors' course of conduct, that prevented their meeting electronically—by phone or email—as well. *See id.* § 22.002 (permitting board meetings by telephone or another suitable electronic communications system).

–10–

negotiations and agreements. *See Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (knowledge held by corporate officers or directors may be imputed to corporation itself).

*The Reasonableness of Sting's Assumptions*

For Watson and Stewart to have apparent authority to agree to sell the Buckingham Property, Corrali must have acted as a reasonably prudent person, using diligence and discretion to ascertain their authority. *See Gaines*, 235 S.W.3d at 182. Corrali had dealt with these men in varying degrees for more than a decade. His testimony established that he knew that TSF owned the Buckingham Property, he knew that the TSF board was composed of three directors, and he knew who those three directors were. When two of those three directors represented to Corrali that they had a deal—after he had agreed to all of their significant terms for the deal—it was reasonable for him to rely on their authority to agree to that deal. Importantly, Watson and Stewart did not mislead Corrali by telling him the agreement to sell would be unanimously approved. On the contrary, they told him that they would outvote Kinder if they were not able to persuade him to agree to approve the sale. Thus, in their candor concerning the lack of unanimity, they conveyed that the two of them were able to make the decision without Kinder.

We acknowledge that this is not a typical agency case. Watson and Stewart were not realtors or employees negotiating a deal on behalf of the corporation's board: TSF's agents here were the individuals ultimately empowered to act as TSF.

–11–

And the agreement at issue did not involve a transient or novel subject matter: Sting had purchased the soccer club, and it leased the Buckingham Property with a shared, longtime understanding that it would purchase the property when it was able to do so. The jury could conclude that Corrali knew Watson and Stewart's status as TSF directors and, therefore, could reasonably rely on their authority to negotiate a sale that had been contemplated by TSF for many years.

We conclude that TSF knowingly permitted its directors—Watson and Stewart—to hold themselves out as having authority to sell the Buckingham Property. We conclude further that Sting—through Corrali, its own principal—acted reasonably in ascertaining Watson's and Stewart's authority. Thus, the evidence is sufficient to support the jury's finding that TSF authorized the agreement with Sting concerning the Buckingham Property. *See Gaines*, 235 S.W.3d at 182. We overrule TSF's first sub-issue.

### *Conducting Business by Electronic Means*

In its second sub-issue, TSF argues that the evidence is insufficient to support the jury's affirmative response to the second charge question:  did the parties agree to conduct the transaction concerning the Buckingham Property by electronic form. Whether parties made such an agreement is governed by statute. TEX. BUS. & COM. CODE ANN. § 322.005(b) ("Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct."). TSF's brief, however, does not cite to or discuss

this statute; indeed, TSF never addresses the question of an agreement to conduct the transaction electronically. At trial, counsel for TSF agreed in its closing that the issue was not in dispute:

> Assuming for a minute you get to Question 2: Did the parties create and conduct a transaction concerning the Buckingham property by electronic form? Nobody has a dispute about that. We could have done it electronically or we could have done it any way as long as it shows you by a preponderance of the evidence that Texas Soccer Foundation as a group agreed to it.

To the extent a ruling is necessary on this issue, we conclude that the volume and content of the parties' emails and text messages concerning the transaction—together with the complete absence of any discussion or exchange of paper documents—indicate that they agreed to conduct this transaction electronically.

Instead of addressing the presence or absence of this agreement in its briefing, TSF argues at length that the parties' communications are insufficient to satisfy the statute of frauds because they do not (1) constitute "a signed memorial of a contract" or (2) comprise an agreement as to the material terms of such a contract. Sting argues that TSF has waived any statute of frauds arguments for failure to submit corresponding questions to the jury. The parties disagree as to their respective burdens on this issue and as to the nature of the statute of frauds issue as a whole.

Whether a contract is governed by the statute of frauds is a question of law. *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 642 (Tex. 2013). A promise or agreement that is governed by the statute of frauds is not enforceable unless the promise or agreement, or a memorandum of it, is in writing and is signed by the entity to be

–13–

charged or by someone lawfully authorized to sign for it. Bus. & Com. § 26.01(a). A contract for the sale of real estate must comply with these requirements. *Id.* § 26.01(b)(4). This much we can determine as a matter of law.

The statute of frauds is an affirmative defense, which must be pleaded by the party relying upon that defense. Tex. R. Civ. P. 94. TSF did plead the defense in its amended answer below. In addition, though, the party asserting the statute of frauds bears the burden of providing evidence establishing its applicability. *Dynegy*, 422 S.W.3d at 642. The statute applies to bar enforcement if the promise or agreement alleged is not in writing or is not signed by the party to be charged. Bus. & Com. § 26.01(a). When there are questions of fact regarding whether the statute's bar applies, those questions must be resolved by the jury. *Namdarkhan v. Glast, Phillips & Murray, P.C.*, No. 05-18-00802-CV, 2020 WL 1969507, at *6 (Tex. App.— Dallas Apr. 24, 2020, pet. denied) (mem. op.). Our review of the parties' briefing and the record leaves us with no doubt that questions of fact existed concerning whether the writings exchanged by the parties satisfied the statute. The parties disagree, and evidence was conflicting, as to whether they intended to be bound only by a manually-signed contract and whether their electronic communications evidenced agreement on all essential terms of the transaction. These fact questions, however, were not submitted to the jury. Indeed no contract formation question was submitted to the jury in this case. *See id.* ("[I]f a factual question renders application of the statute uncertain, such as when the existence of a contract is disputed, the

–14–

proponent of the defense bears the burden of submitting a jury question regarding the disputed fact.").

We conclude that TSF did not carry its burden to obtain findings that would establish the applicability of the defense of statute of frauds. Nor has TSF assigned error on appeal to the trial court's charge. Accordingly, we conclude that TSF has identified no statute of frauds issue for our review.

The jury was asked whether the parties agreed to conduct the transaction electronically; its answer was "yes." We have concluded that sufficient evidence supported that answer. Accordingly, we overrule appellant's second sub-issue.

### *Lack of Mutuality*

TSF's third sub-issue focuses on the following provision of the October 24 Agreement:

> 7 .2 If Seller is not then in default in its obligations or agreements, and Purchaser fails to close the transaction contemplated hereby for any reason, Seller shall be entitled to terminate this Agreement as Seller's sole and exclusive remedy for such failure, Seller hereby specifically waiving any and all rights which it may have to damages or specific performance as a result of Purchaser's default under this Agreement.

TSF contends that because this provision provided a remedy to Sting, but not an identical remedy to TSF, any alleged contract was void and unenforceable for lack of mutuality. "Mutuality of obligation is described simply as valid consideration, which is a bargained for exchange of promises." *Maharishi Sch. of Vedic Sci. v. Olympus Real Estate Corp.*, No. 05-01-00140-CV, 2002 WL 1263894, at *1 (Tex. App.—Dallas June 7, 2002, pet. denied). Lack of consideration is an affirmative

defense, *see Kaye/Bassman Intern. Corp. v. Help Desk Now, Inc.*, 321 S.W.3d 806, 818 (Tex. App.—Dallas 2010, pet. denied), which must be pleaded affirmatively by its proponent. TEX. R. CIV. P. 94. TSF did not plead this defense; nor did it raise the issue until its post-verdict motion.

TSF contends that it was not necessary to plead this lack of mutuality because "the lack of mutuality [a] is apparent on the face of [Sting's] pleading which expressly refers to the alleged contract and [b] is established as a matter of law." We are not persuaded by TSF's argument that *Sting's* identification of the October 24 Agreement as evidence of the parties' agreement sufficed for *TSF* to raise this specific issue affirmatively.[5] Nor can we agree that the defense was established as a matter of law; it is undisputed that the October 24 Agreement called for the fundamental bargained-for-exchange of land for more than one million dollars. And finally, our review of the record does not indicate that the viability of this single

---

[5] Two cases relied upon by TSF speak to defensive issues that were cognizable from the *defensive* pleading. *See Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 937 (Tex. 1992) (although petitioner did not specifically plead "parental immunity," she did affirmatively plead respondent was not entitled to indemnity or contribution); *Dallas Cty. Med. Soc'y v. Ubinas Brache*, 68 S.W.3d 31, 38 (Tex. App.—Dallas 2001, pet. denied) (although defendant did not plead specific statutory provision, defensive pleadings raised immunity for medical peer review and stated there was no cause of action for claims). TSF's third case concludes that unpleaded defenses of res judicata and collateral estoppel were tried by consent and that other grounds not challenged on appeal supported the judgment. *Holladay v. CW & A, Inc.*, 60 S.W.3d 243, 246–47 (Tex. App.—Corpus Christi–Edinburg 2001, pet. denied) (prior judgment discussed at length in trial and trial counsel for appellant repeatedly stated not seeking to collaterally attack that judgment).

remedial clause was somehow tried by consent. TSF identifies no evidence or argument that could support its assertion to that effect.

We overrule TSF's third sub-issue.

### *The Hooks v. Bridgewater Exception to the Statute of Frauds*

In its fourth sub-issue, TSF contends that the evidence is insufficient to support application of the exception to the statute of frauds described in *Hooks v. Bridgewater*, 229 S.W. 1114 (Tex. 1921). In that case, the supreme court identified three elements necessary to remove an oral agreement from the statute of frauds:

> 1. Payment of the consideration, whether it be in money or services. 2. Possession by the vendee. And 3. The making by the vendee of valuable and permanent improvements upon the land with the consent of the vendor; or, without such improvements, the presence of such facts as would make the transaction a fraud upon the purchaser if it were not enforced.

*Id.* at 126–27.

We have concluded that the agreement at issue in this case is not barred by the statute of frauds. Accordingly, no issue concerning an exception to that defense is relevant to our decision. We overrule TSF's fourth sub-issue.

### *Conclusion as to TSF's JNOV Motion*

We have overruled each of TSF's challenges to the trial court's denial of its JNOV Motion. We, therefore, overrule TSF's first issue.

### Attorney's Fees

In its second issue, TSF argues that Sting cannot recover its attorney's fees (a) if we reverse its entitlement to specific performance, because it would not be the

–17–

prevailing party under the parties' agreement, and (b) because it did not plead and prove a proper demand pursuant to chapter 38 of the Texas Civil Practice and Remedies Code. We have overruled TSF's challenges to the trial court's judgment; Sting is the prevailing party in this case. It is therefore entitled to recover its fees pursuant to the parties' agreement. We overrule TSF's second issue.

## Conclusion

We affirm the trial court's judgment.

191228f.p05

/Bill Pedersen, III//
BILL PEDERSEN, III
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TEXAS SOCCER FOUNDATION, Appellant

No. 05-19-01228-CV      V.

STING SOCCER FOUNDATION, Appellee

On Appeal from the 193rd Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-17-07441. Opinion delivered by Justice Pedersen, III. Justices Partida-Kipness and Goldstein participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Sting Soccer Foundation recover its costs of this appeal from appellant Texas Soccer Foundation.

Judgment entered this 29th day of September, 2021.